

DA 12-0373

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 132

BRAD MOLNAR,

      Petitioner and Appellant,

    v.

MARY JO FOX,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 10-1718
Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Kenneth D. Peterson; Attorney at Law; Billings, Montana

      For Appellee:

          Joel E. Guthals; Guthals, Hunnes & Ruess, P.C.; Billings, Montana

      For Amicus Curiae:

          Jay P. Dufrechou; Dufrechou Law Firm, P.C.; Helena, Montana
(Montana Commissioner of Political Practices)

Submitted on Briefs: January 23, 2013
Decided: May 14, 2013

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Brad Molnar (Molnar) appeals from the order of the Thirteenth Judicial District Court affirming the decision of the Commissioner of Political Practices (the Commissioner) holding that Molnar violated the Code of Ethics. We affirm and address the following issues:

¶2     *1. Did the District Court err by concluding that Fox had legal standing to file ethics complaints against Molnar?*

¶3     *2. Did the District Court err by concluding that Molnar received unlawful gifts in violation of § 2-2-104, MCA?*

¶4     *3. Did the District Court err by concluding that Molnar improperly used State facilities for political purposes in violation of § 2-2-121(3)(a), MCA?*

¶5     *4. Did the District Court err by concluding that the penalty statute for ethics violations, §2-2-136, MCA, was not unconstitutionally vague?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     Molnar served two terms as a Public Service Commissioner (PSC), representing District #2, which encompasses Billings and southeastern Montana. The PSC is comprised of five elected commissioners who supervise and regulate the operations of public utilities, common carriers, railroads, and other regulated industries. During the summer and fall of 2008, Molnar was serving his first term at the PSC and was also a candidate for reelection to his position. Mary Jo Fox (Fox), a resident of District #2 and campaign manager for Molnar's opponent in the election, filed four complaints against Molnar with the Commissioner, alleging that Molnar had violated the statutory Code of Ethics by accepting gifts of substantial value from two corporations with which the PSC

2

regularly dealt, and by using state resources to aid his reelection campaign and for personal business. Molnar denied any wrongdoing.

**June 12, 2008 Complaint**

¶7 Fox's first complaint alleged that Molnar accepted unlawful gifts from corporate entities to support an event called the "Billings Brownout." Molnar was the principal organizer of the event, wherein Billings residents and businesses voluntarily reduced electrical consumption for an hour—by turning lights off, for example—to raise awareness about energy conservation. Molnar solicited funds in support of the Brownout from several businesses. Fox took issue with Molnar's receipt of money from NorthWestern Energy (NorthWestern) and PPL Montana (PPL). Molnar approached one of NorthWestern's corporate officers, William Thomas, during a break in a PSC hearing in which NorthWestern was participating. Molnar explained the Brownout event and asked Thomas for "money for brochures" for the event. Thomas agreed, and NorthWestern sent a check for $1,000 to Molnar, made personally to him. Molnar deposited the check into his personal bank account. Molnar also requested $1,000 from PPL. PPL generates electricity at its coal-fired and hydroelectric power plants in Montana. While not directly regulated by the PSC, PPL regularly appears before the PSC for hearings, and intervenes in administrative proceedings. PPL agreed to help fund the Brownout and sent a $1,000 check to Molnar, also made personally to him. Molnar likewise deposited this check into his personal bank account.

3

¶8     Molnar printed brochures that described the Brownout event, explained how to conserve electricity, and thanked sponsors. The brochures bore Molnar's name and picture, and read, in part:

Public Service Commissioner
Brad Molnar
Invites you to join your
neighbors and take part in the
Great Billings Brownout

¶9     The Brownout took place on December 6, 2007, and was, by all accounts, a success. In the spring of 2008, Molnar used some of the Brownout brochures by leaving them at homes while campaigning door-to-door for reelection. Meanwhile, in response to another request by Molnar, NorthWestern sent a check for $1,000 to Molnar to help sponsor a proposed event called the "Laurel Brownout." However, when NorthWestern learned that Molnar was using the Brownout brochures in his campaign, it demanded repayment of the entire $2,000 donated to the two Brownout events. Molnar sent a personal check of $1,000 to NorthWestern as a refund for the Billings Brownout donation and returned the $1,000 check NorthWestern had just sent him for the Laurel Brownout. Molnar continued to use the brochures, but after NorthWestern and other Brownout contributors complained about the use of the brochures in his campaign, Molnar affixed an adhesive sticker over the complaining contributors' names that read:

The "Brown out" may be over.
But the energy tips are still good!
BRAD MOLNAR
Your Conservation Candidate For
Public Service Commissioner

4

**October 9, 2008 Complaint**

¶10    Fox's second complaint accused Molnar of using his PSC e-mail address, PSC phone number, and PSC computer in his reelection campaign.  Molnar created a four-page fundraising letter (the Fundraising Letter) dated July 21, 2008, in which he solicited campaign funds.  The Fundraising Letter listed Molnar's PSC email address and his PSC telephone number as his contact information.  During this same time period, Molnar also listed his PSC email address as his contact information on his campaign website: http://molnar4psc.com (now defunct).

**October 16, 2008 Complaint**

¶11    Fox's third complaint alleged that Molnar unlawfully used his PSC-issued cellular phone to advertise his personal rental property.  During his first term on the PSC, Molnar placed a newspaper advertisement soliciting a roommate to share a Helena residential unit that he leased.  In the advertisement, Molnar listed his PSC cellular phone number and recorded a message on its voicemail for prospective roommates.  Molnar used the PSC cell phone and voicemail because his former roommate had moved out and disconnected the residential landline.

**October 27, 2008 Complaint**

¶12    Fox's fourth complaint also accused Molnar of using his PSC-issued computer system, laptop computer, and email system for campaign purposes.  Fox attached numerous emails to her complaint.[1]   During the summer of 2007, Molnar exchanged

---

[1] Fox obtained from the PSC emails and documents from Molnar's computer through a public information request.

emails with a representative of the Great Falls Rotary Club about an upcoming talk he was giving to the group. While the initial emails covered subjects typical of a speaking engagement—*e.g.*, speaking topics, location, and directions—Molnar's emails following the talk turned political:

> As you know, my position is an elected one and I'm up next election cycle. And earned media is free media. Would it be possible for you, or one of the others that seemed to enjoy my talk, to drop an editorial to the papers listed below? Just a simple thing about how lucky they are to have a commissioner that is so darn knowledgeable and willing to travel on his own dime to educate the public. . . . Please?

Molnar thereafter listed the newspapers he wanted the editorial letter sent to, all within PSC District #2.

¶13 Between May 12 and May 13, 2008, Molnar sent three emails related to his campaign to the *Billings Outpost* newspaper (*Billings Outpost* emails) through his PSC email account. The first email was a campaign "press release" accusing his opponent of being too cozy with the companies regulated by the PSC. In the second, Molnar postured for an upcoming debate with his opponent:

> Dear Editor,
> Mr. Tussing desires to debate me? OK. Perhaps two debates. We can rent a phone booth to accommodate those that care about his revisionist rant of "deregulation" legislation passed eleven years ago and we can use the MSUB Theater to address those that are concerned about future policies and how they will be personally affected.

The third email to the *Billings Outpost* was another campaign editorial.

¶14 Molnar also used his PSC email to make arrangements to attend the Miles City Bucking Horse Sale and parade. The record includes a photograph showing Molnar

6

wearing a "Brad Molnar" campaign t-shirt and walking in the Bucking Horse Sale parade with other candidates. Molnar reported the gasoline expenses incurred in traveling to and from this event as a campaign-finance expenditure.

¶15    William L. Corbett, a professor of law at the University of Montana (Professor Corbett), was appointed as hearing examiner, and conducted a three-day hearing on Fox's complaints in November 2009. In March 2010, Professor Corbett issued a proposed decision, determining that Molnar violated § 2-2-104, MCA, two times by receiving "gifts of substantial value" from NorthWestern and PPL, and violated § 2-2-121, MCA, five times by using state facilities and equipment for election purposes, as follows: the Fundraising Letter, the campaign website, the Great Falls Rotary solicitation for a campaign letter to the editor, the *Billings Outpost* emails,[2] and the Bucking Horse Sale campaign arrangements. Professor Corbett recommended that Fox's October 16, 2008 complaint be dismissed because Molnar's "very limited use" of the PSC cellular phone to find a roommate amounted to permissible, *de minimus* personal use of state equipment. Professor Corbett recommended a fine of $1,000 for each violation of § 2-2-104, MCA, ($2,000), and a fine of $750 for each violation of § 2-2-121, MCA, ($3,750), for a total fine of $5,750.

¶16    The Commissioner made minor revisions to Professor Corbett's proposed decision and affirmed the result. In addition to the fines, the Commissioner ordered Molnar to pay $14,945 for the costs of the hearing. Molnar petitioned for judicial review of the

---

[2] Professor Corbett treated the three emails to the *Billings Outpost* as one violation because they were sent in such "close proximity" to each other.

Commissioner's decision, and the District Court affirmed the Commissioner's order. Molnar appeals.

## STANDARD OF REVIEW

¶17 The same standards of judicial review of a final agency decision apply to the district court and this Court. *Williamson v. Mont. Pub. Serv. Commn.*, 2012 MT 32, ¶ 25, 364 Mont. 128, 272 P.3d 71. Judicial review of a "final agency decision must be conducted by the court without a jury and must be confined to the record." *Williamson*, ¶ 25 (citing § 2-4-704(1), MCA). We review agency findings of fact under the clearly erroneous standard. *Williamson*, ¶ 25. A finding of fact is "clearly erroneous" if "it is not supported by substantial evidence in the record, if the fact-finder misapprehended the effect of the evidence, or if a review of the record leaves the court with a definite and firm conviction that a mistake has been made." *Williamson*, ¶ 25. We review agency conclusions of law *de novo*, to determine if the agency correctly interpreted and applied the law. *Williamson*, ¶ 25.

## DISCUSSION

¶18 Article XIII, Section 4 of the Montana Constitution requires that the Legislature "provide a code of ethics prohibiting conflict between public duty and private interest for members of the legislature and all state and local officers and employees." In 1977, the Legislature enacted Montana's Code of Ethics (the Code or Code of Ethics). *See* Laws of Montana 1977, ch. 569, §§ 1-11 (codified at §§ 2-2-101, MCA through 2-2-304, MCA). The Code recognizes that public confidence in the integrity of state officials, legislators

8

and state employees is paramount to the overall effectiveness and legitimacy of the government. Section 2-2-103(1), MCA. The Code prohibits "conflict between public duty and private interest," § 2-2-101, MCA, by providing rules of conduct "the transgression of any of which is a violation of the public duty[.]" Section 2-2-103(3), MCA. The Commissioner is charged with investigating alleged violations of the Code. Section 2-2-136(2), MCA.

¶19 *1. Did the District Court err by concluding that Fox had legal standing to file ethics complaints against Molnar?*

¶20 The District Court concluded that Fox had standing to bring her ethics complaints because the Code of Ethics permits any "person" alleging a violation to file a complaint. Molnar argues that allowing any person to bring an ethics complaint runs afoul of the usual standing requirement that the complaining party be harmed in some way particular to her, and not merely in the same way as the general public.

¶21 Recently, in *Williamson*, we addressed standing in the context of administrative proceedings. There, a group of individuals filed a complaint with the PSC against NorthWestern, seeking to force NorthWestern to replace existing streetlight bulbs with energy-efficient LED bulbs. *Williamson*, ¶ 6. The individuals claimed that NorthWestern's use of the existing, inferior bulbs affected them through higher property tax bills and damage to the environment. *Williamson*, ¶ 14. NorthWestern moved to dismiss the complaint because these harms did not meet the typical standing requirement that the alleged harm be "distinguishable from [an] injury to the public generally."

9

*Williamson*, ¶ 15. We distinguished judicial standing requirements from those applicable to statutory administrative proceedings:

> While acknowledging that . . . standing requirements arose as limitations on the judicial power of Montana's courts, NorthWestern seeks to import them into PSC proceedings. This is incorrect. "The judicial power of the state is vested in one supreme court, district courts, justice courts, and such other courts as may be provided by law." Mont. Const. art. VII, § 1. The PSC is not a "court." It is an Executive Branch agency.

*Williamson*, ¶ 29. Because the PSC is an administrative agency, standing was governed by the statute designating those permitted to bring a complaint. *Williamson*, ¶ 31. That statute, § 69-3-321(1), MCA, provided that a complaint could be brought by a party "directly affected" by the challenged policy. *Williamson*, ¶ 32. Under the facts, we concluded that the individuals bringing the complaint were not "directly affected" by NorthWestern's use of the existing streetlight bulbs because the alleged harms—higher property taxes and environmental damage—were "too attenuated" and "speculative" to be considered to directly affect them. *Williamson*, ¶¶ 34-43. Because the allegations failed to meet the "directly affected" standard, we held that the complainants lacked standing under the governing statute. *Williamson*, ¶ 43.

¶22 The analysis here is even more straightforward. The Office of the Commissioner is an "administrative agency." *See* § 2-15-411, MCA (establishing the Executive Branch agency of the "commissioner of political practices"). Whether Fox has standing to bring an ethics complaint against Molnar depends on the statute that designates who may initiate an ethics complaint before the Commissioner. *Williamson*, ¶ 31; *Baxter Homeowners Assn. Inc. v. Angel*, 2013 MT 83, ¶ 17, ___ Mont. ___, ___ P.3d ___.

10

Section 2-2-136(1), MCA, provides, in pertinent part: "A person alleging a violation of this part by a state officer, legislator, or state employee may file a complaint with the commissioner of political practices." By its simple terms, § 2-2-136(1), MCA, grants any "person" standing to file an ethics complaint. *See also* Admin. R. M. 44.10.604(1) ("A complaint may be filed with the commissioner by *any person* alleging a violation of the ethics code by a state officer, state employee, or a legislator . . . .") (emphasis added). The District Court correctly determined that Fox had standing to bring an ethics complaint to the Commissioner against Molnar.

¶23 *2. Did the District Court err by concluding that Molnar received unlawful gifts in violation of § 2-2-104, MCA?*

¶24 The District Court concluded that the $1,000 Molnar received from both NorthWestern Energy and PPL were "unlawful gifts." Molnar first asserts that these monies were not "gifts" under the Code. Alternatively, Molnar argues that even if the monies were gifts they were not "unlawful" because (1) the $2,000 would not have improperly influenced him to favor these companies in PSC proceedings, and (2) the money was used for educational activities permitted by the Code.

¶25 Under the Code, a breach of public duty occurs when a "public officer . . . accept[s] a gift of substantial value . . . that would tend improperly to influence a reasonable person in the person's position to depart from the faithful and impartial discharge of the person's public duty." Section 2-2-104(1)(b)(i), MCA. A "gift of substantial value" is defined as "a gift with a value of $50 or more for an individual." Section 2-2-102, MCA.

11

¶26 The Code does not define "gift," and Molnar urges us to adopt a narrow definition that would prohibit transfers only when the donee received the item or money "without restrictions." Molnar argues that he did not receive the $2,000 "without restrictions" because NorthWestern and PPL donated the funds for the legitimate purpose of promoting "cost-effective energy conservation[.]" Admin. R. M. 42.29.106. However, Molnar misapprehends the focus of the inquiry. The Code governs the conduct of public officers and employees, not the conduct or motivations of donating parties. The focus of the Code is what the public officer has received.

¶27 The Commissioner has interpreted "gift" broadly to mean "something voluntarily transferred by one to another without compensation." *In re Complaint of the Mont. Democratic Party v. Judy Martz*, at 16-17 (Sept. 25, 2002); *In re Complaint of L. David Frasier v. Barb Charlton & Mark Simonich*, at 7 (May 2, 2005). The Commissioner used that interpretation in this case. "[A]dministrative interpretations are not binding on the courts," but "they are entitled to 'respectful consideration.'" *Mont. Power Co. v. Mont. PSC*, 2001 MT 102, ¶ 25, 305 Mont. 260, 26 P.3d 91 (citation omitted). "[T]he long and continued contemporaneous and practical interpretation of a statute by the executive officers charged with its administration and enforcement constitutes an 'invaluable aid in determining the meaning of a doubtful statute.'" *Mont. Power Co.*, ¶ 24 (citation omitted). The Commissioner is an executive officer "charged with the administration" of § 2-2-104(1)(b)(i), MCA. In giving respectful consideration to the interpretation given

12

by the Commissioner in the past, we conclude that he properly defined "gift" under the statute.

¶28 Molnar thus accepted "gifts" of substantial value. NorthWestern Energy and PPL Montana each "voluntarily transferred" $1,000 to Molnar personally, and he deposited those monies into a personal bank account. Molnar did not exchange anything of that value with the companies. The amounts of these transfers were "substantial" because they had "a value of $50 or more." Section 2-2-102(3)(a), MCA.

¶29 Next, whether Molnar's acceptance of the two $1,000 gifts was unlawful turns on whether that money "would tend improperly to influence a reasonable person in [Molnar's] position to depart from the faithful and impartial discharge of the person's public duty." Section 2-2-104(1)(b)(i), MCA. Under the plain meaning of this provision, the inquiry is not whether the gifts, in fact, influenced Molnar to depart from the faithful and impartial discharge of his public duties (a subjective standard), but, rather, whether the gifts would tend to improperly influence a "reasonable person" in Molnar's position (an objective standard).

¶30 The PSC exerts economically significant regulatory authority over NorthWestern, including the rates that NorthWestern can charge. As Molnar admitted during his testimony, the PSC, technically, would have to decide whether NorthWestern could ultimately include the $1,000 gift to Molnar as an eligible expenditure in its rate base. If so, NorthWestern's customers would ultimately pay for the contribution to the Billings Brownout. A reasonable person acting in Molnar's position would likely support

13

inclusion of the expenditure within the rate base, given his promotion of the event. This would necessarily constitute a departure from an "impartial discharge" of Molnar's duties as a PSC Commissioner. In other words, Molnar's acceptance of gifts for that purpose would given him a vested interest in the expense determination. As Professor Corbett reasoned, for a regulator to look to the regulated as a source of money is fraught with problems of improper influence:

> A regulator who views those regulated as the source of current and future money gifts would be influenced by the transaction. The Latin maximum quid-pro-quo—something given for something given—is unmistakable. It is reasonable to conclude that an elected regulator who solicits money from the regulated will look for and find some way to repay the implied obligation. The repayment may not amount to a large gesture. It may be a quick look away, a nod of the head, or the acknowledgement one team player gives another. But the fact that they are in it together will not be forgotten, and in some way, the gift will be acknowledged. While individual intentions and motivations may remain strong to the contrary, the opportunity of a small deviation or slight hesitation from the faithful and impartial discharge of public duty may result. The deviation or hesitation may be so small that no one in the room will notice, and even the parties may not fully recognize the departure from public duty, but there it will be—the quid pro quo.

We conclude the District Court correctly held that NorthWestern's gift would tend to improperly influence a reasonable person in Molnar's position. Section 2-2-104(1)(b)(i), MCA.

¶31 Unlike NorthWestern, the PSC does not directly regulate PPL. However, the record demonstrates that PPL "regularly" appears before the PSC as an intervening party. PPL lawyers call and cross-examine witnesses in these proceedings. While Professor Corbett addressed his above-quoted example to parties "regulated" by the PSC, we see no

14

reason why this logic would not also extend to parties whose interests include intervening and regularly participating in PSC proceedings, such as PPL. Given the similar closeness of this relationship, we cannot conclude that the Commissioner erred in holding that the donation of $1,000 would tend to improperly influence a reasonable person in Molnar's position toward PPL.

¶32 Alternatively, Molnar argues that even if the $2,000 he received from NorthWestern and PPL were "gifts," they were lawful because the money was to be used to educate the Billings community about energy conservation, including printing of educational materials (brochures) for the event. Molnar correctly points out that some gifts valued in excess of $50 are permitted by the Code. Section 2-2-102(3), MCA, provides that the term "gift of substantial value" does not include:

> (iii) educational material directly related to official governmental duties; [or]
>
> . . .
>
> (v) educational activity that:
>    (A) does not place or appear to place the recipient under obligation;
>    (B) clearly serves the public good; and
>    (C) is not lavish or extravagant.

¶33 However, we conclude these exemptions do not apply here. Money given directly and personally to Molnar does not constitute "educational material" or "educational activity" contemplated by the statute. Molnar essentially asks us to revise the statute by adding the word "for" in each of these exemptions, thus permitting the personal receipt of money that is ultimately used "for" educational activity or "for" educational material. However, it is axiomatic that in the "construction of a statute, the office of the judge is

15

simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or omit what has been inserted." Section 1-2-101, MCA. This case demonstrates the necessity of carefully applying the statute as written. If we were to read the educational exemptions as broadly permitting the transfer of money directly to state officers so long as the money was ultimately used "for" educational material or activity, the prohibition against receiving substantial gifts could be easily circumvented, as here. Molnar's brochures were partly educational, but also partly self-promotional. They contained conservation tips but also included a picture of Molnar and a reference to his position on the PSC. Elected officials could easily include "educational" content in otherwise self-promotional materials to come within a broad reading of the educational exemptions, allowing the exception to swallow the rule.

¶34 The District Court correctly concluded that the exemptions did not apply because money transferred directly and personally to Molnar was neither an educational activity nor educational material. The gifts to Molnar were thus made in violation of the Code of Ethics.

¶35 *3. Did the District Court err by concluding that Molnar improperly used State facilities for political purposes in violation of § 2-2-121(3)(a), MCA?*

¶36 The District Court held that Molnar improperly used State resources for political purposes by: (1) including his PSC email address and PSC phone number on the Fundraising Letter, (2) using his PSC email address on his campaign website, (3) using his PSC email address to solicit a campaign editorial from the Great Falls Rotary Club,

16

(4) using his PSC email to send the *Billings Outpost* emails, and (5) using his PSC email to arrange accommodations for a campaign appearance at the Bucking Horse Sale.

¶37 The Code of Ethics prohibits any public officer or public employee from using "public time, facilities, equipment, supplies, personnel, or funds to solicit support for . . . the election of any person to public office . . . ." Section 2-2-121(3)(a), MCA.

¶38 The statute's first prohibition is the use of "public time" to engage in election-related activities. For the typical public employee, this restriction would apply to those hours for which the employee receives compensation from his or her employer. However, as Molnar points out, elected officials do not have specified hours of employment, vacation leave or other off-duty time, and are thus considered to be on "public time" at all times. Applying a "public time" prohibition to elected officials results in a readily apparent absurdity: elected officials could never use their time to seek reelection without violating the Code of Ethics. "Statutory construction should not lead to absurd results if a reasonable interpretation can avoid it." *Bitterroot River Protective Assn. v. Bitterroot Conserv. Dist.*, 2008 MT 377, ¶ 72, 346 Mont. 507, 198 P.3d 219 (citing *Mont. Sports Shooting Assn. v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003). Such an interpretation would also raise constitutional concerns. *See City of San Diego v. Roe*, 543 U.S. 77, 80, 125 S. Ct. 521, 523 (1995) ("A government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment."). We attempt to interpret a statute "so as to avoid an

17

unconstitutional interpretation whenever possible." *State v. Samples*, 2008 MT 416, ¶ 14, 347 Mont. 292, 198 P.3d 803.

¶39 These same concerns were noted in a Montana Attorney General's opinion interpreting this statute:

> Although "public time" is not defined, a reasonable construction would be those hours for which an employee receives payment from a public employer. Elected officials, of course, do not have specific hours of employment nor do they receive vacation leave or other time off duty. They receive annual salaries rather than hourly wages. Thus, they could be considered to be on "public time" at all times. However, as long as public facilities, equipment, supplies, or funds are not involved, elected officials are not restricted in the exercise of political speech by the provisions of Montana law.

Mont. Atty. Gen. Op. 51-1, 2005 Mont. AG LEXIS 1 at **4-5. We agree. To avoid absurdity and constitutional problems, we construe § 2-2-121(3), MCA, to permit an elected official to use his or her time to pursue election-related activities so long as the official does not use "public facilities, equipment, supplies or funds." In this case, whether Molnar violated § 2-2-121(3), MCA, depends on whether he used public facilities in his reelection campaign, not whether he used his time.

¶40 Molnar's Fundraising Letter bore his PSC-issued email address and phone number, and his campaign website bore his PSC-issued email address. The Letter explicitly solicited financial support for Molnar's 2008 reelection and, true to its purpose, Molnar's campaign website likewise advocated for his reelection to the PSC with bold writing at the top "Brad Molnar for Public Service Commissioner." Molnar thus employed public facilities to further his reelection effort.

18

¶41 Molnar argues that state rules regarding telecommunications use permitted the use of his PSC email address and phone number, which he describes as a minimal use. The state telecommunications rule provides: "The use of the state's telecommunication systems for *essential personal* business must be kept to a minimum, and not interfere with the conduct of state business." Admin. R. M. 2.13.102 (2012) (emphasis added). Thus, while the regulation permits the use of state phones, internet and email to conduct minimal personal business, it does not authorize any political uses. This distinction is clear and important.

¶42 Molnar also argues that, even if he improperly used the PSC's telecommunications system, the proper enforcement entity was the PSC, not the Commissioner. He cites Admin. R. M. 2.13.103 (2012), which provides that "[a]ll state agencies are individually responsible for enforcing rules relating to the use of the state's telecommunications systems." However, while this regulation imposes an affirmative duty on each state agency to enforce the state policy governing use of the state telecommunication system, it does not preempt enforcement of the ethical statutes by the Commissioner. Violation of a telecommunication policy may or may not also constitute a violation of the Code, and jurisdiction here by state agencies is overlapping in that regard.

¶43 Molnar argues that Fox failed to prove he actually sent out the Fundraising Letter. The record, however, shows that Molnar received a phone call from reporter Mike Dennison, who had received the Fundraising Letter and contacted Molnar to inquire about the letter and informed him it was illegal. There was thus sufficient evidence to

19

demonstrate the Letter had been sent or used. Finally, Molnar argues that if he did violate the Code in this manner, his violations were *de minimus*. However, as the Commissioner noted: "there is nothing minor about the violations. A re-election campaign document and website that directs citizens to contact the candidate at their official state office is exactly what the Code of Ethics was designed to prohibit."

¶44 The District Court correctly concluded that Molnar used public facilities to solicit support for his reelection to the PSC in violation of § 2-2-121(3)(a), MCA, when he posted his PSC email address on his campaign website and listed his PSC address email and phone number as his contact information in the Fundraising Letter.

¶45 The remaining violations pertain to the *Billings Outpost* emails, the Great Falls Rotary Group email, and the emails Molnar sent to make accommodations for the campaign event at the Bucking Horse Sale. Molnar argues that he did not violate § 2-2-121(3)(a), MCA, by sending these emails because there is no proof that he was "on the job" or at his "place of employment" when he sent them.[3] However, § 2-2-121(3)(a),

---

[3] Molnar cites to several decisions by the Commissioner in support of his position. Each is distinguishable, however. First, Molnar argues that the Commissioner's decision *In re Complaint of Michael Fasbender against Ken Toole* (Feb. 21, 2012), held that an elected official does not violate the statute unless the official uses the public facility *during working hours*. But, that is not the principle articulated in that case. Rather, *In re Complaint of Fasbender* stands for the proposition that *anyone*, including elected officials, may use pictures taken in State-owned buildings for campaign purposes so long as the area is open to the general public. The Commissioner reasoned that it would make little sense to allow the general public to use photographs taken inside and outside public buildings but prohibit incumbents seeking reelection from doing so. Here, however, Molnar's PSC email address is not open for use by the general public. The other Commissioner decisions cited by Molnar are likewise unhelpful to him because they involve a *campaign contribution statute* and not an ethics statute. The statute at issue in those cases, § 13-35-226(4), prohibits a public employee from soliciting support or opposition to a candidate while "on the job or at the place of employment." *See e.g. In re*

MCA, does not prohibit the use of public facilities only while on the job or while at work. The statute clearly prohibits all use of "public facilities" for campaign purposes. It is improper for an elected official to send a campaign email from a State account at any time of the day. Likewise, geographic location is irrelevant under the statute. State "facilities" such as email accounts and laptop computers may readily be accessed and used at locations outside of state buildings. It is unlawful for an elected official to use state facilities for political purposes whether in a government office or elsewhere.

¶46 The District Court did not err in affirming the Commissioner's conclusion that Molnar violated § 2-2-121(3)(a), MCA, by using "public facilities" to solicit support for his reelection.

¶47 *4. Did the District Court err by concluding that the penalty statute for ethics violations, §2-2-136, MCA, was not unconstitutionally vague?*

¶48 The Commissioner ordered Molnar to pay a $5,750 administrative penalty for his seven violations of the Code of Ethics. The Commissioner also ordered Molnar to pay $14,945 to the State as partial reimbursement of the costs in this matter. Molnar offers a very brief argument, with little citation to authority, that this penalty and cost assessment should be reversed because the Code's penalty provision is unconstitutionally vague for failing to specify whether the Commissioner may impose a separate fine for each violation or only a single fine regardless of the number of violations.

¶49 "[A]ll statutes carry with them a presumption of constitutionality." *Mont. Auto Assn. v. Greely*, 193 Mont. 378, 382, 632 P.2d 300, 303 (1981). Thus, a party

*Complaint against Dave Galt*, at 2 (Jul. 26, 2004). The *ethics statute* at issue here, § 2-2-121(3), contains no such language.

21

challenging the constitutionality bears the heavy burden of proving the statute is unconstitutional "beyond a reasonable doubt." *Hernandez v. Bd. of County Commns.*, 2008 MT 251, ¶ 15, 345 Mont. 1, 189 P.3d 638. We conclude that Molnar's brief argument fails to carry the burden of demonstrating that the statute is unconstitutional and that the Commissioner's imposition of separate fines was otherwise unlawful.

¶50 We affirm the District Court on all issues raised on appeal.


/S/ JIM RICE


We concur:

/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS
/S/ BETH BAKER
/S/ LAURIE McKINNON