BEA, Circuit Judge) dissenting: Our representative government requires and relies on the ready flow of ideas between elected legislators and the voters. Those ideas are mostly transmitted during election campaigns by advertisements and organized rallies, examples of free speech, neither of which come free. Contributors to the campaigns want their ideas made known and accepted by the campaigning legislators. Restrictions on citizens’ campaign contributions limit' their ability to make their ideas known and to influence the legislators to accept and further those ideas. For these reasons,-our First Amendment law permits limits on such contributions only if the restrictions are closely drawn to a valid, important state interest. Courts must carefully scrutinize such limitations. See McCutcheon v. FEC, — U.S. —, 134 S.Ct. 1434, 1451, 188 L.Ed.2d 468 (2014) (“the First Amendment requires us to err on the side of protecting political speech rather than suppressing it” (citation omitted)). Here, the district court properly evaluated the evidence submitted by Montana’s officials and found the officials had not established the only constitutionally permissible and valid state interest sufficient to justify Montana’s campaign contribution limits: the prevention of corruption or its appearance. Thus, I respectfully dissent. In Montana Right to Life v. Eddleman, 343 F.3d 1085, 1092 (9th Cir. 2003), we upheld Montana’s campaign contribution limits under a two-part test: 1) the contribution limits must respond to a valid important state interest and 2) the contribution limits must be closely drawn to that interest. In that decision, we recognized that discouraging “undue influence” gained over legislators by contributors through them contributions could be a valid important state interest. 343 F.3d at 1096-97. As we recognized in Lair v. Bullock, 798 F.3d 736, 747 (9th Cir. 2015), the Supreme Court’s plurality decision in Randall v. Sorrell, 548 U.S. 230, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006), which held Vermont’s campaign contribution limits unconstitutional under the First Amendment, did not alter Eddleman’s framework because no opinion received the support of a majority of the justices. If Citizens United had not been decided the way it was, the Montana officials’ claims here of a valid important state interest would make this an easy case for reversal. But Citizens United changed all that because it narrowed what can constitute a valid important state interest (at Eddleman’s first step) to only the state’s interest in eliminating or reducing quid pro quo corruption or its appearance. The Supreme Court explained in FEC v. National Conservative Political Action Committee that “[t]he hallmark of corruption is the financial quid pro quo: dollars for political favors.” 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). The mere prevention of influence on legislators by contributors is now not a valid important state interest that could justify campaign contribution limits. Citizens United v. FEC, 558 U.S. 310, 359, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010); see also McCutcheon, 134 S.Ct. at 1441. As 'such, only the avoidance of corruption or the appearance of corruption remain as a state interest valid and important enough to limit the free speech rights of contributors exercised through their contributions to their legislators. To establish this sole valid important state interest defendants here must demonstrate that the existence of actual or apparent quid pro quo corruption is more than “mere conjecture” and is not “illusory.”[1] Eddleman, 343 F.3d at 1092. While an appellate court’s review of a district court’s factual findings is more rigorous in the First Amendment, context, our prior precedent has confirmed that we still review such factual findings with some deference. See Newton v. Nat'l Broad. Co., 930 F.2d 662, 670 (9th Cir. 1990) (“[W]e must simultaneously ensure the appropriate appellate protection of First Amendment values and still defer to the findings of the trier of fact.”); see also Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058, 1066-70 (9th Cir. 2002). Because the district court entered judgment on cross motions for summary judgment, however, a de novo standard of review as to the existence of a material triable issue of fact properly applies here. A close examination of relevant evidence from the record makes clear that the district court’s finding that defendants failed to carry their burden to prove the appearance or existence of quid pro quo corruption at the first' step of Eddleman, as narrowed by Citizens United, was correct even if reviewed under a de novo standard. That is because the record here is devoid of any evidence of exchanges of dollars for political favors—much less for any actions contrary to legislators’ obligations of office—or any reason to believe the appearance of such exchanges will develop in the future. First, consider the letter sent by Senator Mike Anderson to his party-colleagues, urging them to vote for a bill so that money from certain political action committees would continue to flow to the Republican Party’s coffers. None of the record evidence shows that any legislator accepted the deal articulated by Senator Anderson and, despite five separate investigations, Anderson himself was never found to have engaged in any unlawful practices. Eddleman, 343 F.3d at 1093. Rather than actual or apparent quid pro quo corruption, the event shows rejection of temptation. Next, consider the offer to contribute $100,000 to the Republican Legislative Campaign Committee in exchange for Republican legislators’ support for a right-to-work bill, as testified to by Senator Bruce Tutvedt. This offer also did not constitute quid pro quo corruption because the Republican legislators rejected it. Further, they likely would have introduced and supported such a right-to-work bill regardless of this offer, as it was consistent with their political party’s policy position. More importantly, even had certain legislators accepted these offers (as Representative Hal Harper’s generalized testimony suggests sometimes occurred), such actions would appear to constitute nothing more than the trading of influence and access, which are critical mechanisms through which our political system responds to the needs of constituents. See Citizens United, 130 S.Ct. at 910 (“that speakers may have influence over or access . to elected officials does not mean that these officials are corrupt”). Similarly, the Montana state court decisions referenced by defendants do not establish actual or apparent' quid pro quo corruption. These include: • The Montana Supreme Court held in 2013 that a Public Service Commissioner unlawfully accepted financial gifts from power companies that “would tend to improperly influence a reasonable person in [the Commissioner’s] position,” a number of which payments the Commissioner returned to the contributor shortly after they were received. Molnar v. Fox, 370 Mont. 238, 301 P.3d 824, 832 (2013). • Two Montana state trial court deci- , sions found that two 2010 legislative primary candidates violated state- ■ campaign finance laws by accepting Corporate contributions in return for promising 100 percent support for the corporations’ agenda and without properly reporting such contributions. Comm’r of Political Practices v. Boniek, XADV-2014-202 (1st Jud. Dist. Mont. 2015); Comm’r of Political Practices v. Prouse, DDV-2014-250 (1st Jud. Dist. Mont. 2016). None of these cases involved bribery or the improper trading of official acts by violating.a legislator’s legal obligations for monetary .contributions. Two of these cases (Boniek and Prouse) were default judgments against individuals who never even made it to a general election (each lost in the Republican primaries), making quid pro quo corruption in each circumstance impossible as neither candidate ever held any office from which to grant official favors. Although the Montana court that adjudicated Boniek and Prouse labeled the conduct in both of these cases as “corruption,” the court did not delineate which official actions taken by defendants in these cases constituted an illegal official act, define what “corruption” meant in this context, or explain how this finding was related to the legal claims against defendants before that court. Moreover, defendants Boniek and Prouse already held outspoken conservative positions on issues like right-to-work, abortion, guns, and government, meaning that any official acts they may have taken to further the interests of conservative contributors had they been elected would have been consistent with their' longstanding policy positions and not primarily motivated as an exchange of an illegal official act for campaign contributions. Finally, the declaration of Montana’s Commissioner of Political Practices (Jonathan Motl) that numerous cases of quid pro quo corruption occurred in Montana was rebutted by sworn declarations from the very politicians and political candidates who, according to Motl, engaged in quid pro quo corruption. Given defendant Motl’s position as Commissioner of Political Practices, which gives him broad authority to investigate political misdeeds, see Montana Code Annotated § 13-37-111, it is surprising, to say the least, that the only enforcement actions against purported quid pro quo corruption in Montana, cited by defendants are the above-referenced, non-starter cases for violations of campaign finance or ethics rules. One would expect that if quid pro quo corruption was as widespread as, Commissioner Motl asserts, he could point at least to some actual court convictions for bribery or other forms of quid pro quo corruption. Taken together, a detailed examination of the- evidence offered by defendants establishes that the district court concluded correctly that the record evidence failed to prove any actual quid pro quo corruption. This still leaves the possibility that the evidence in the record establishes the appearance of corruption in Montana. As Buckley v. Valeo explained, “[o]f almost equal concern as the danger ’ of actual quid, pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions.” 424 U.S. 1, 27, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); see also McCutcheon, 134 S.Ct. at 1450. Tn other words, the appearance of quid pro quo corruption is the “public awareness of the opp'ortunities for abuse.” For the very reasons discussed above, however, none of the-.record evidence establishes the existence of any opportunity for quid pro quo corruption or other abuses. Where is the evidence that a legislator caused the re-routing» of a freeway to benefit a commercial landowner,-who--had paid the legislator’s vacation travels? Where is the evidence that an airport construction contractor was awarded a contract, and had remodeled the legislator’s home at little or no cost to the legislator? Rather, the record makes clear, that Montana politicians often rejected even efforts by certain interests to influence or access legislators, that even seemingly minor violations of campaign finance laws by unelected primary candidates were rigorously punished, and that Montana’s Commissioner of Political Practices consistently reviewed- the propriety and legality of the actions of politicians, political candidates, and various interest, groups. In other words, the only reasonable inference that may be drawn from the record evidence is that there were few opportunities for abuse and, therefore, scant public awareness of such opportunities. As such, on this record the existence of actual or apparent quid pro quo corruption is, at best, “illusory” or “mere conjecture,” such that defendants have not met their burden to establish a valid important state interest to justify the contribution limits at issue in this lawsuit. Eddleman, 343 F.3d at 1092. While it is admittedly difficult at times to distinguish between proscribed corruption and acceptable influence, given the important First Amendment interests at stake when restricting political speech we are obliged to scrutinize carefully whether a valid important state interest exists before upholding the constitutionality of such restrictions. See McCutcheon, 134 S.Ct. at 1451 (“The line between quid pro quo corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights.”). Although there is admittedly some common sense to the notion that limiting the amount of money citizens may contribute to political candidates inherently forestalls corruption, because so doing also restricts speech our federal constitution requires a greater evi-dentiary showing than made on this record before a state may restrict political speech through campaign contribution limits. While the panel majority’s opinion pays lip service to the changes in the Eddleman framework rendered by Citizens. United, the contents of its analysis at Eddleman⅛ first step demonstrate it has failed to account substantively for this change. In footnote 5, the majority opinion notes that “[ujnder the dissent’s logic...Montana’s evidence is inadequate to justify any contribution limit whatsoever, no matter how high.” This is quite correct. Absent a showing of the existence or appearance of quid pro quo corruption based on objective evidence, the presence of a subjective sense that there is a risk of such corruption or its appearance does not justify a limit on campaign contributions. Restrictions on speech must be based on fact, not conjecture. Because I do not think defendants established the existence of a valid important state interest at step one of the Eddleman framework, I respectfully dissent. . A common sense understanding of quid pro quo corruption suggests that it is limited to exchanges in which a politician personally pockets money in exchange for an official action that violated the politician’s obligations of office. The notion that contributions to a candidate’s campaign fund, one of the key mechanisms by which constituents influence their elected representatives, could ever constitute part of an improper exchange for an . official act seems implausible since the contribution of funds to a campaign to effect influence is their expected and proper purpose. Despite this, the Supreme Court has earlier recognized that quid pro quo corruption includes occasions when "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns," McCutcheon, 134 S.Ct. at 1460-61 (quoting FEC v. Nat’l Conservative Political Action Comm., 470 U.S. at 497, 105 S.Ct. 1459 (emphasis added)). As such, under Supreme Court precedent contributions made for the permissible purpose of influencing legislators can apparently constitute quid pro quo corruption in certain circumstances. Such influence is improper corruption when, in fact, the legislator acts contrary to his legal obligation(s). In our record, there is no evidence of such an illegal act.