FILED

03/31/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0040

DA 25-0040

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2025 MT 64

ALL FAMILIES HEALTHCARE; BLUE
MOUNTAIN CLINIC; and HELEN WEEMS,
MSN, APRN-FNP, on behalf of themselves,
and their employees, and their patients,

      Plaintiffs and Appellees,

  v.

STATE OF MONTANA; MONTANA
DEPARTMENT OF PUBLIC HEALTH
AND HUMAN SERVICES; and CHARLIE
BRERETON, in his official capacity as
Director of the Department of Public Health
and Human Services,

      Defendants and Appellants.

APPEAL FROM:    District Court of the First Judicial District,
                     In and For the County of Lewis and Clark, Cause No. DDV-2023-592
                     Honorable Christopher D. Abbott, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Austin Knudsen, Montana Attorney General, Michael D. Russell, Thane
            Johnson, Michael Noonan, Assistant Attorneys General, Helena,
            Montana

      For Appellees:

            Alex Rate, ACLU of Montana, Missoula, Montana

            Hillary Schneller, Center for Reproductive Rights, New York, New York

            Jacqueline Harrington, Nina S. Riegelsberger, Tabitha Crosier, Dechert
            LLP, New York, New York

Hartley M.K. West, Iricel Payano, Dechert LLP, San Francisco, California

_____

Submitted on Briefs:  November 17, 2025

Decided:  March 31, 2026

Filed:

_____

2

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 The State appeals the November 15, 2024 Opinion and Order on Motion for Preliminary Injunction ("Order") of the First Judicial District Court, Lewis and Clark County. The District Court held that House Bill 937 ("HB 937") and Admin. R. M. 37.106.3101 through 37.106.3114 (2024) ("the Rules") likely violate the Plaintiffs' equal protection rights under the Montana Constitution. The District Court concluded that the Plaintiffs properly demonstrated that each of the four elements of the preliminary injunction standard were met and preliminarily enjoined HB 937 and the Rules in their entirety. We affirm.

¶2 We restate the issue on appeal as follows:

*Did the District Court abuse its discretion in granting a preliminary injunction that enjoined HB 937 and the Rules in their entirety?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 During the 2023 legislative session, the Montana legislature passed HB 937. 2023 Mont. Laws ch. 492. HB 937 subjects "abortion clinics" to various licensure and regulatory requirements and directs the Department of Public Health and Human Services ("the DPHHS") to adopt various rules implementing HB 937. HB 937 was scheduled to take effect on October 1, 2023.

¶4 On September 1, 2023, All Families Healthcare, Blue Mountain Clinic, and Helen Weems, MSN, APRN-FNP (collectively, "the Plaintiffs") filed a complaint on behalf of themselves, their employees, and their patients against the State of Montana, the DPHHS, and Charlie Brereton, in his official capacity as Director of the DPHHS (collectively, "the

3

State"). The Plaintiffs sought a temporary restraining order ("TRO") and a preliminary injunction enjoining HB 937 on the basis that it violates various provisions of the Montana Constitution. On September 27, 2023, the District Court granted the Plaintiffs' motion for a TRO and ordered the parties to appear for a preliminary injunction hearing. On October 18, 2023, based upon the parties' stipulation, the District Court vacated the hearing and extended the TRO for a period of sixty (60) days beyond the effective date of the final rules issued by the DPHHS. On September 20, 2024, the DPHHS promulgated the final rules, which were effective immediately. The Rules are codified at Admin. R. M. 37.106.3101 through 37.106.3114 (2024).

¶5 HB 937 is one of many laws passed by the Montana legislature aimed at monitoring and regulating abortion. *See, e.g.*, 2005 Mont. Laws ch. 519, § 27 (allowing only licensed physicians and physician assistants-certified to perform pre-viability abortions); 2021 Mont. Laws ch. 307, § 3 (banning abortion at twenty weeks from the patient's last menstrual period); 2021 Mont. Laws ch. 309 (requiring new credentialing, informed consent, and reporting requirements and eliminating telehealth for medication abortions); 2021 Mont. Laws ch. 308, § 1 (requiring abortion providers to offer patients the opportunity to view an ultrasound and heartbeat); 2013 Mont. Laws ch. 307 (conditioning a minor's ability to obtain an abortion on parental consent); 2023 Mont. Laws ch. 490 (prohibiting dilation and evacuation abortions and subjecting providers to penalties); 2023 Mont. Laws ch. 389 (requiring an ultrasound prior to an abortion); 2023 Mont. Laws ch. 488 (barring Medicaid from covering abortion services performed by certain providers); 2023 Mont. Laws ch. 491 (prohibiting use of public funds for abortions and providing exceptions).

Because these laws impact the fundamental right to privacy under Article II of Montana's Constitution, they are not entitled to a presumption of constitutionality. *Mont. Democratic Party v. Jacobsen*, 2024 MT 66, ¶ 11, 416 Mont. 44, 545 P.3d 1074 ("If the challenger shows an infringement on a fundamental right, a presumption of constitutionality is no longer available.") As authority for the proposition that the presumption of constitutionality must yield in the face of an infringement of a fundamental right, this Court drew on the reasoning of *Mont. Auto. Ass'n v. Greely*, 193 Mont. 378, 632 P.2d 300 (1981), wherein we analogously held that "[w]hen it has been demonstrated that a statute infringes on First Amendment freedoms, a presumption of constitutionality is no longer available." *Greely*, 193 Mont. at 382-383, 632 P.2d at 303. In November 2024, voters approved by a 58% to 42% margin, Constitutional Initiative No. 128 (CI-128), the Right to Abortion Initiative. Montanans now have an explicit amendment to the Montana Constitution that enshrines the right to abortion.

¶6 HB 937 (codified in Title 50, Chapter 20, Part 9, MCA) defines "abortion clinic" as a facility that "performs surgical abortion procedures" or "provides an abortion-inducing drug" to at least five patients per year. Since All Families Healthcare and Blue Mountain Clinic each offer abortions to at least five people per year, they fall within the definition of "abortion clinics." Under HB 937, All Families Healthcare and Blue Mountain Clinic would not be able to legally offer their abortion services without a license issued by the DPHHS. 2023 Mont. Laws ch. 492, § 2.

¶7 Section 5 of HB 937 amends § 50-5-101, MCA, and adds "abortion clinics" to the definition of "health care facilities." Consequently, HB 937 requires "abortion clinics" to

5

comply with the requirements "health care facilities" are subject to under Title 50, Chapter 5, MCA. Prior to HB 937, the term "health care facility" specifically excluded the "offices of private physicians, dentists, or other physical or mental health care workers regulated under Title 37, including licensed addiction counselors." Section 50-5-101(26)(b), MCA (2021). Abortion providers, including All Families Healthcare and Blue Mountain Clinic, previously fell within this statutory exclusion and were not required to be licensed by the DPHHS. While HB 937 retains the same language excluding certain offices from licensing by the DPHHS, it affirmatively subjects all "abortion clinics" to the requirements of "health care facilities."

¶8 Section 3 of HB 937 directs the DPHHS to adopt numerous rules, including but not limited to rules establishing minimum license qualifications; requirements for sanitation, staff, emergency care, and the physical layout of the abortion clinic; and procedures and standards for inspections. Section 4 also mandates the DPHHS to inspect an "abortion clinic" at least once per year.

¶9 The Rules promulgated by the DPHHS implemented the language of HB 937. Admin. R. M. 37.106.3101(1) (2024) states that "[t]he purpose of these rules is to establish the minimum licensing requirements for the licensure of abortion clinics." Importantly, miscarriage treatment providers (who do not perform at least five abortions per year) do not fall within the definition of "abortion clinics" and therefore are excluded from the requirements under HB 937 and the Rules. While miscarriage treatment providers and abortion providers were previously treated similarly under § 50-5-101(26)(b), MCA (2021), "abortion clinics" are now treated differently than miscarriage treatment providers.

6

The Rules lay out various minimum standards of "abortion clinics" for licensing by the DPHHS, relating to physical plant requirements, policies and procedures, medical director qualifications, staff files, patient files, sanitation, emergency procedures, anesthesia, quality assurance, infection prevention and control, safety, and emergency preparedness. Admin. R. M. 37.106.3102-3114 (2024). None of these requirements apply to miscarriage-only treatment providers who provide identical medications and procedures as "abortion clinics."

¶10 In support of their motion for a TRO and preliminary injunction, the Plaintiffs submitted affidavits from Helen Weems, MSN, APRN-FNP; Joey Banks, MD; and Jennifer Mayo, MD. Drawing from their respective medical backgrounds, these individuals opine that the medications and procedures used for abortion care are identical to the medications and procedures used to manage miscarriages. They maintain that HB 937 and the Rules promulgate various detailed requirements for "abortion clinics" but do not apply those requirements to miscarriage treatment providers offering the same medications and procedures. They also cite studies demonstrating that abortion care was and still is very safe.

¶11 All Families Healthcare and Blue Mountain Clinic are already subject to various federal, state, and professional oversight. For instance, individual providers must be licensed by the Department of Labor and Industry ("the DLI") under Title 37, MCA. The Plaintiffs highlight that the State has identified no specific health or safety reason for now subjecting "abortion clinics" to additional requirements under HB 937 and the Rules. They also detail why the various requirements are not medically necessary and explain how

7

enforcement of HB 937 and the Rules could force All Families Healthcare and Blue Mountain Clinic to shut down to come into compliance (if compliance with the Rules is even possible), thereby inhibiting their patients' access to abortion services temporarily and/or permanently.

¶12    The Rules provide for waivers:

> Certain of these requirements may be waived if not necessary in light of the scope of, and any gestational limits on, the abortions to be performed or provided by the applicant or licensed abortion clinic. . . . Unless otherwise provided in these rules, general requirements and provisions and requirements pertaining to the abortion services provided by the abortion clinic may not be waived.

Admin. R. M. 37.106.3101(5)(a) (2024).   However, the Rules fail to define "general requirements and provisions" and fail to specify how exactly the DPHHS determines when a waiver is appropriate.

¶13    Shortly after the Rules were finalized, All Families Healthcare and Blue Mountain Clinic applied for licenses and requested waivers from the DPHHS.  The State did not act on these applications.  On October 7, 2024, the Plaintiffs again moved for a TRO and preliminary injunction, this time seeking to enjoin both HB 937 and the Rules.  The District Court held a hearing on the motion on November 8, 2024, and the State offered one witness, Tara Wooten, the licensure bureau chief of the DPHHS.  Neither she nor the State identified any *specific* health or safety reason for singling out "abortion clinics" from miscarriage treatment providers.  Ms. Wooten testified that to her knowledge, "abortion clinics" were operating without safety incidents prior to HB 937.

8

¶14     The District Court granted the Plaintiffs' motion and preliminarily enjoined HB 937 and the Rules in their entirety on the basis that HB 937 and the Rules likely violate the Plaintiffs' and their patients' right to equal protection under the Montana Constitution.[1] On January 14, 2025, the State filed a notice of appeal to this Court.

**STANDARD OF REVIEW**

¶15     A grant or denial of a preliminary injunction is reviewed for manifest abuse of discretion. *Weems v. State*, 2019 MT 98, ¶ 7, 395 Mont. 350, 440 P.3d 4 ("*Weems I*"). A manifest abuse of discretion exists if it is an "obvious, evident, or unmistakable" abuse of discretion. *Davis v. Westphal*, 2017 MT 276, ¶ 10, 389 Mont. 251, 405 P.3d 73 (internal quotations omitted). A district court abuses its discretion when it acts "arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice." *Planned Parenthood of Mont. v. State*, 2022 MT 157, ¶ 5, 409 Mont. 378, 515 P.3d 301 ("*Planned Parenthood I*") (internal quotations omitted). When a district court's decision regarding a preliminary injunction is based on legal conclusions, "we review those conclusions to determine if the court's interpretation of the law was correct." *Montanans Against Irresponsible Densification, LLC v. State*, 2024 MT 200, ¶ 8, 418 Mont. 78, 555 P.3d 759 ("*MAID*").

---

[1] For purposes of this appeal, the only relevant claim is the equal protection claim.

**DISCUSSION**

¶16 *Did the District Court abuse its discretion in granting a preliminary injunction that enjoined HB 937 and the Rules in their entirety?*

***Preliminary Injunction Standard***

¶17 As a threshold issue, we must clarify which preliminary injunction standard applies here. The State contends that the District Court abused its discretion by purportedly following the sliding scale approach we adopted in *Stensvad*. *See Stensvad v. Newman Ayers Ranch, Inc.*, 2024 MT 246, 418 Mont. 378, 557 P.3d 1240. On appeal, the State urges this Court to retroactively apply the 2025 amendment to § 27-19-201, MCA, which, according to the State, abrogates any use of the sliding scale approach in Montana.

¶18 In 2023, the Montana legislature amended the standard for issuance of preliminary injunctions under § 27-19-201, MCA. Prior to the 2023 amendments, the preliminary injunction standard was a disjunctive test. Section 27-19-201, MCA (2021). Under the 2023 version, a party seeking a preliminary injunction is required to prove each of the following four elements:

(a) the applicant is likely to succeed on the merits;
(b) the applicant is likely to suffer irreparable harm in the absence of preliminary relief;
(c) the balance of equities tips in the applicant's favor; and
(d) the order is in the public interest.

Section 27-19-201(1), MCA (2023). The legislature intended the foregoing statutory language to "mirror the federal preliminary injunction standard, and that interpretation and application of subsection (1) closely follow United States [S]upreme [C]ourt case law." Section 27-19-201(4), MCA (2023).

¶19     In 2024, after thoroughly evaluating the federal circuit splits regarding how each of the four elements were weighed, we clarified Montana's approach and adopted the Ninth Circuit's "serious questions test," a version of the sliding scale approach. *Stensvad*, ¶¶ 12-25. Under the serious questions test, if an applicant demonstrates "serious questions going to the merits" and shows that the "balance of hardships . . . tips sharply towards the plaintiff," the plaintiff need not prove the likelihood of success on the merits. *Stensvad*, ¶ 23 (internal quotations omitted). The applicant must still prove the other two elements— that the applicant is likely to suffer irreparable harm and that the injunction is in the public interest—before a district court may grant a preliminary injunction. *Stensvad*, ¶ 23.

¶20     The serious questions test adopted by this Court in *Stensvad* merely set the floor for granting a preliminary injunction in Montana. *Stensvad* did not *require* district courts to apply the serious questions test in lieu of finding that each of the elements in § 27-19-201(1), MCA, were independently met. *See Stensvad*, ¶ 26 (emphasizing the importance of flexibility in the preliminary injunction context). Instead, this Court held in *Stensvad* that the serious questions test was a sufficient means of showing that the requirements of § 27-19-201(1), MCA, were met when it is particularly difficult for applicants to prove they are likely to succeed on the merits. *Stensvad*, ¶ 29. Of course, an individual showing that each of the four elements are met, without any weighing between the elements, still satisfies the plain language of § 27-19-201(1), MCA (2023).

¶21     During the 2025 legislative session, the Montana legislature amended § 27-19-201, MCA, again. Particularly, the legislature added a subsection that states:

When conducting the preliminary injunction analysis, the court shall examine the four criteria in subsection (1) independently. The court may not use a sliding scale test, the serious questions test, flexible interplay, or another federal circuit modification to the criteria.

Section 27-19-201(4)(b), MCA (2025). The rest of the statute remains identical to the 2023 version.

¶22 While the District Court acknowledged *Stensvad* and the serious questions test in its Order, it went on to find that each of the four elements of the preliminary injunction test were individually met, namely that the Plaintiffs are *likely to succeed* on the merits. Thus, we need not specify which preliminary injunction standard applies because the Plaintiffs have satisfied their burden well beyond the requirements of the serious questions test, and the District Court did not rely on the serious questions test in granting the preliminary injunction. *See State v. Tome*, 2021 MT 229, ¶ 31, 405 Mont. 292, 495 P.3d 54 (explaining that "'if it is not necessary to decide more, it is necessary not to decide more'" (quoting *Morse v. Frederick*, 551 U.S. 393, 431, 127 S. Ct. 2618, 2641-42 (2007) (Breyer, J., concurring in the judgment in part and dissenting in part))).

***Likelihood of Success on the Merits***

¶23 "Statutes are presumed to be constitutional, and we regard that presumed constitutionality as a high burden to overcome." *Weems v. State*, 2023 MT 82, ¶ 34, 412 Mont. 132, 529 P.3d 798 ("*Weems II*"). However, the presumption of constitutionality does not exist if the challenger shows an infringement of a fundamental right under Article II of Montana's Constitution, such as an equal protection and right to privacy violation as here alleged. *Mont. Democratic Party*, ¶ 11; *Greely*, 193 Mont. at 382-83, 632 P.2d at 303.

12

The burden of proof is on the party challenging the statute. *Molnar v. Fox*, 2013 MT 132, ¶ 49, 370 Mont. 238, 301 P.3d 824. So as not to infringe on the separation of powers, we acknowledge that "it is the Legislature's prerogative to legislate under their general police power, and not merely in those areas we do not consider fundamental." *Weems II*, ¶ 34.

¶24 Here, we conclude the District Court did not abuse its discretion by finding that the Plaintiffs are likely to succeed on their equal protection claim.

¶25 Montana's equal protection clause states: "No person shall be denied the equal protection of the laws." Mont. Const. art. II, § 4. The protections provided under Montana's equal protection clause are even broader than the protections provided under the Fourteenth Amendment to the U.S. Constitution. *Planned Parenthood of Mont. v. State*, 2024 MT 228, ¶ 29, 418 Mont. 253, 557 P.3d 440 ("*Planned Parenthood IV*").

¶26 An equal protection analysis involves three steps. First, we identify the classes involved and determine if they are similarly situated. *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 16, 325 Mont. 148, 104 P.3d 445. After identifying the classes, we determine which level of scrutiny applies: strict scrutiny, middle-tier scrutiny, or the rational basis test. *Snetsinger*, ¶ 17. Finally, we apply the appropriate level of scrutiny to the challenged law. *Planned Parenthood of Mont. v. State*, 2024 MT 178, ¶ 26, 417 Mont. 457, 554 P.3d 153 ("*Planned Parenthood II*"). We address each step in turn.

¶27 "The goal of identifying a similarly situated class is to isolate the factor allegedly subject to impermissible discrimination." *Goble v. Mont. State Fund*, 2014 MT 99, ¶ 29, 374 Mont. 453, 325 P.3d 1211. Discrimination does not exist in a vacuum: it is only discovered when people in similar circumstances are treated unequally. *Planned*

13

*Parenthood II*, ¶ 27. "[T]wo groups are similarly situated if they are equivalent in all relevant respects other than the factor . . . constituting the alleged discrimination." *Planned Parenthood II*, ¶ 27; *Goble*, ¶ 29. Even if the law contains an apparently neutral classification, it may still violate Montana's equal protection clause if in reality, it operates as a device that imposes different burdens on different classes of people. *Snetsinger*, ¶ 16.

¶28 The District Court concluded, and we agree, that HB 937 divides providers into two similarly situated classes, which are equivalent but for the alleged discrimination likely inherent within the framework of HB 937 and the Rules. The first class includes healthcare providers regulated by the DLI under Title 37, MCA, who prescribe mifepristone and/or misoprostol or perform dilation and evacuation or vacuum aspiration procedures for *the purpose of managing miscarriages*. The second class includes healthcare providers regulated by the DLI under Title 37, MCA, who prescribe mifepristone and/or misoprostol or perform dilation and evacuation or vacuum aspiration procedures for *the purpose of inducing at least five abortions annually*. As the Plaintiffs explain, providers who fall into the former class do not fall under HB 937 and the Rules, but as soon as those providers offer the same medications and procedures for the purpose of inducing abortion for at least five people in one year, they become subject to the requirements under HB 937 and the Rules. Therefore, the single factor differentiating the classes is the purpose of the treatment offered—either to treat a miscarriage or induce an abortion. HB 937 and the Rules single out "abortion clinics." None of the provisions apply to the class of miscarriage treatment providers who do not offer abortions yet provide identical medications and procedures.

14

¶29 Importantly, the definition of "health care facility" remains unchanged in that it still does "not include offices of private physicians, dentists, or other physical or mental health care workers regulated under Title 37, including licensed addiction counselors." 2023 Mont. Laws ch. 492, § 5. At the preliminary injunction hearing presided over by the District Court, the State's witness clarified that prior to HB 937, All Families Healthcare and Blue Mountain Clinic fell within this statutory carve-out, meaning they were not required to be licensed by the DPHHS. HB 937 removes "abortion clinics" from the pre-existing statutory exception and affirmatively subjects All Families Healthcare and Blue Mountain Clinic to requirements unique to "abortion clinics" and the requirements of other "health care facilities." As a result, HB 937 likely impermissibly discriminates between two similarly situated classes that only differ in the purpose for which they are offering identical medications and procedures.

¶30 The Plaintiffs produced affidavits supporting the District Court's finding that the medications and procedures used for managing miscarriages are basically identical to the medications and procedures used to induce an abortion. This Court has also recently recognized "that the protocols, procedures, and the attendant complications of abortion care are identical to miscarriage care." *Weems II*, ¶ 47. The State has not offered evidence to demonstrate that the similarly situated classes involved here differ in any other factor beyond the purpose for which the providers offer the treatment. While HB 937 and the Rules make substantial changes to the requirements of "abortion clinics," they fail to apply those same changes to providers who offer the same kinds of services for the purpose of managing miscarriages.

15

¶31 We note that for the purpose of identifying similarly situated classes within the equal protection analysis, if the Montana legislature had decided to also include clinics who provide only miscarriage care within the framework of HB 937 and not single out "abortion clinics," the equal protection analysis would differ. The Plaintiffs agree that such an analysis would differ. Yet, here, the class distinctions are apparent: if a clinic provides the same medications and procedures for the purpose of providing an abortion to at least five people per year, it falls within HB 937 and the Rules, but if a clinic provides the same medications and procedures for the purpose of miscarriage treatment, it is specifically excepted from the law. The District Court did not abuse its discretion by finding that the purpose of the services—abortion or miscarriage treatment—is the single factor of alleged discrimination that differentiates the otherwise equivalent classes.

¶32 Our prior holdings further support the conclusion that the classes are similarly situated but for the purpose of the treatment sought. In *Planned Parenthood II*, when analyzing an act that conditioned a minor's right to obtain an abortion on parental consent, we defined the two similarly situated classes as "a class of pregnant minors who want to obtain an abortion and a class of pregnant minors who do not want an abortion." *Planned Parenthood II*, ¶ 28. We reasoned that both classes involved pregnant minors, but the act only applied to minors choosing to have an abortion. In other words, the classes differed based on the purpose for which medical treatment was sought. If medical treatment was sought for an abortion, a minor needed consent; if medical treatment was sought for carrying a pregnancy to term, a minor needed no consent. *Planned Parenthood II*, ¶ 28. Similarly, here, HB 937 likely distinguishes between two classes on the basis of the intent

16

of the treatment sought: a woman seeking medical treatment for the purpose of an abortion must use a provider who complies with HB 937 and the Rules, but a woman seeking the same medical treatment for the purpose of managing a miscarriage can use a provider who is not licensed under HB 937.

¶33 Similarly, in *Planned Parenthood IV*, when analyzing laws regarding Medicaid funding of abortion, we defined the two similarly situated classes as a class of pregnant women on Medicaid seeking medical care for an abortion and a class of pregnant women on Medicaid seeking medical care to carry the pregnancy to term. *Planned Parenthood IV*, ¶ 31. Again, we concluded that the laws distinguished otherwise similarly situated classes based on the purpose for which treatment was sought. At this preliminary stage of the proceedings and considering the evidence put forth by the parties, the same conclusion is likely merited here.

¶34 Now that we have defined the two similarly situated classes, we must analyze whether the District Court erred in determining that strict scrutiny applied.

¶35 When reviewing a preliminary injunction, "we may review whether the district court applied the proper level of judicial scrutiny to enjoin an allegedly unconstitutional statute." *Mont. Cannabis Indus. Ass'n v. State*, 2012 MT 201, ¶ 13, 366 Mont. 224, 286 P.3d 1161 ("*MCIA I*"). "Strict scrutiny applies to an equal protection challenge 'when a law affects a suspect class or threatens a fundamental right.'" *Planned Parenthood IV*, ¶ 23 (quoting *Reesor v. Mont. State Fund*, 2004 MT 370, ¶ 13, 325 Mont. 1, 103 P.3d 1019). While initially the burden resides with the Plaintiffs to show the challenged law is unconstitutional, under strict scrutiny the burden shifts to the State to demonstrate that

17

"'the law is narrowly tailored to serve a compelling government interest.'" *Planned Parenthood IV*, ¶ 23 (quoting *Reesor*, ¶ 13). When the classifications affect a right conferred by the Montana Constitution but not contained in the Constitution's declaration of rights, middle-tier scrutiny is appropriate. *MCIA I*, ¶ 16. Rational-basis review is appropriate when neither strict scrutiny nor middle-tier scrutiny apply. *MCIA I*, ¶ 16.

¶36 The right to privacy is considered a fundamental right. *Armstrong v. State*, 1999 MT 261, ¶ 34, 296 Mont. 361, 989 P.2d 364. "It is, 'perhaps, one of the most important rights guaranteed to the citizens of this State, and its separate textual protection in our Constitution reflects Montanans' historical abhorrence and distrust of excessive governmental interference in their personal lives.'" *Armstrong*, ¶ 34 (quoting *Gryczan v. State*, 283 Mont. 433, 455, 942 P.2d 112, 125 (1997)). Legislation that infringes on the right to privacy requires a strict-scrutiny analysis, and the burden shifts to the State to show that the legislation is "justified by a compelling state interest and . . . narrowly tailored to effectuate only that compelling interest." *Armstrong*, ¶ 34; *Planned Parenthood IV*, ¶ 23. Therefore, to determine the appropriate level of scrutiny, we must first determine if HB 937 and the Rules threaten the right to privacy—a fundamental right. We conclude that they likely do by limiting the pool of qualified abortion providers. Accordingly, HB 937 is not entitled to a presumption of constitutionality and is subject to strict scrutiny.

¶37 The State argues that the District Court erred by creating a "new" fundamental right for abortion providers to work free from any regulation. The State agrees that the right to privacy is fundamental but argues that the bearers of that right are the patients, not the providers. We find this distinction unhelpful and conclude that the fundamental right to

18

privacy of patients is implicated by the Plaintiffs' equal protection challenge to HB 937 and the Rules. The District Court did not create a "new" fundamental right for providers.

¶38 Our past cases addressing the standing of providers to bring claims on behalf of their patients helpfully show that no "new" fundamental right is implicated here. We have held that abortion providers have standing to bring claims implicating the right to privacy on behalf of their patients. *See Armstrong*, ¶¶ 4-13. In *Armstrong*, we concluded that the plaintiff "health care providers have standing to assert on behalf of their women patients the individual privacy rights under Montana's Constitution of such women to obtain a pre-viability abortion from a health care provider *of their choosing*." *Armstrong*, ¶ 13 (emphasis added). Here, while the distinction between the two similarly situated classes ultimately rests upon whether the *providers* fall under the definition of "abortion clinic," the differing treatment of the two classes of providers likely implicates the individual privacy rights of the Plaintiffs' *patients*. For example, if certain providers fall under the definition of "abortion clinics" (which the Plaintiffs do), those providers may not operate unless they meet the licensure and other requirements under HB 937 and the Rules. Under HB 937 and the Rules, patients seeking an abortion would only be able to legally obtain care from those facilities in compliance with the framework; however, patients seeking miscarriage treatment would be able to choose from a larger pool of providers not subject to the framework. While the classes themselves are defined as differentiating between *providers*, HB 937 necessarily implicates an individual *patient's* right to privacy because it likely interferes with that patient's free right to choose and access a qualified provider.

19

¶39 This conclusion is consistent with our analysis in *Planned Parenthood IV* regarding Medicaid funding of abortion. The rule contested there sought, in part, to bar abortion coverage provided by anyone other than a physician. *Planned Parenthood IV*, ¶ 5. The State argued that the plaintiff providers lacked standing to sue on behalf of their patients because the rule at issue did not "impact the constitutional rights of women patients." *Planned Parenthood IV*, ¶ 19. The State contended that the challenged rule regulated *providers* not *patients* (similar to the argument advanced by the State here), dealt with "simple funding issues," and thus did not implicate the right to privacy so as to trigger strict scrutiny. *Planned Parenthood IV*, ¶¶ 19-20, 22. We concluded that the State's standing challenge was without merit and agreed with the providers that the challenged rule, while facially regulating which providers could perform abortions and which ones could not, still implicated the constitutional rights of the patients. *Planned Parenthood IV*, ¶ 19. We found that it was appropriate for the district court to apply strict scrutiny to the equal protection claim because the rule went beyond "simple funding decisions" and implicated "the constitutional rights of Medicaid-eligible Montanans." *Planned Parenthood IV*, ¶ 24. The same logic likely runs true here. While the State attempts to frame HB 937 and the Rules as mere licensure and safety requirements, the State cannot avoid the conclusion that the framework implicates the right to privacy of patients seeking an abortion by limiting the eligible pool of abortion providers.

¶40 The State asserts that rational-basis review should apply here because not all restrictions on abortion necessarily improperly infringe on the right to privacy. The State refers to *Weems II* to support this contention. In *Weems II*, we indeed noted that "every

restriction on medical care does not necessarily impermissibly infringe on the right to privacy." *Weems II*, ¶ 38. We emphasized that the State retains general and inherent authority to regulate for citizens' health and safety. *Weems II*, ¶ 38. "Montanans do not possess an unqualified right to obtain medical care free of State regulation." *Weems II*, ¶ 38. The State has the power to "regulate and license health care professionals." *Weems II*, ¶ 38; *Wiser v. State*, 2006 MT 20, ¶ 18, 331 Mont. 28, 129 P.3d 133. These sentiments remain true.

¶41 However, *Weems II* does not support the State's position. In *Weems II*, we addressed the constitutionality of a statute that made it illegal for any licensed provider other than a physician or physician assistant (PA) to provide early abortion care. *Weems II*, ¶ 4. We noted:

> The State maintains that because the statute does not implicate the decision to seek and obtain an abortion but, instead, implicates the State's authority to protect public health and safety, rational basis review should be applied to assess its constitutionality. We easily conclude that ship has already sailed.

*Weems II*, ¶ 42. Similarly, here, the State maintains that rational basis review should apply to the majority of HB 937 and the Rules. Specifically, the State contends that strict scrutiny only applies in the right to privacy context when the law either directly regulates the abortion procedures themselves or prohibits a category of providers from offering abortion care. We have never held that the right to privacy in the abortion context is only implicated when the challenged law lands in one of those two buckets. *Weems II* controls, and a law implicates a patient's fundamental right to privacy and triggers strict scrutiny when

qualified professionals are removed "from the pool of health care providers from which women may choose to obtain lawful medical procedures." *Weems II*, ¶ 43.

¶42 The Plaintiffs have demonstrated it is likely that if the licensure requirements of HB 937 and the Rules become enforceable, the Plaintiffs may be forced to stop providing abortion care and removed from the pool of health care providers offering abortion services. Therefore, the District Court did not abuse its discretion by determining that strict scrutiny likely applies to the Plaintiffs' equal protection claim.

¶43 We now turn to the final step in the equal protection analysis and consider if the District Court properly applied strict scrutiny to HB 937 and the Rules.[2] Since strict scrutiny is likely triggered, the burden shifts to the State to show a compelling state interest that is narrowly tailored to effectuate only that compelling interest. *Planned Parenthood IV*, ¶ 21. "A narrowly tailored law is the least onerous path that can be taken to achieve the state objective." *Planned Parenthood of Mont. v. State*, 2024 MT 227, ¶ 24, 418 Mont. 226, 557 P.3d 471 ("*Planned Parenthood III*") (internal quotations omitted).

¶44 The District Court did not abuse its discretion by concluding that the State has failed to meet its burden at this preliminary stage. In its briefing, the State has failed to advance any argument that shows it has a compelling state interest in promulgating HB 937 and the Rules. At the hearing in front of the District Court, the State and the State's witness offered no evidence to support any compelling state interest. Instead, the State rests its argument

---

[2] The State argues that even if certain provisions trigger strict scrutiny, we should review each provision independently and apply rational basis review to the ones that do not trigger right to privacy concerns. We disagree and address this argument in the severability section below.

on the proposition that strict scrutiny should not apply at all. The State took a similar approach in *Planned Parenthood IV* and *Weems II*. *See Planned Parenthood IV*, ¶ 27; *Weems II*, ¶ 42. While we acknowledge that "we are not obligated to develop arguments on behalf of parties to an appeal, nor are we to guess a party's precise position, or develop legal analysis that may lend support to his position," we will still conduct our own preliminary review of HB 937 and the Rules under strict scrutiny as we have done before. *Planned Parenthood IV*, ¶ 27 (internal quotations omitted).

¶45 "'In narrowly defined instances, the state, by clear and convincing evidence, may demonstrate a compelling interest in and obligation to legislate or regulate to preserve the safety, health and welfare of a particular class of patients or the general public from a medically-acknowledged, [bona fide] health risk.'" *Planned Parenthood IV*, ¶ 28 (quoting *Armstrong*, ¶ 59); *see Planned Parenthood II*, ¶ 31. Even if the State had put forth evidence to justify HB 937 and the Rules on the basis that they reflect a compelling state interest in protecting pregnant women from a medically-acknowledged, bona-fide health risk, we definitively rejected the argument in *Weems II* that abortion care can reasonably be singled out as more dangerous than miscarriage care. *Weems II*, ¶¶ 46-48. In *Weems II*, benefiting from a fully developed record, we readily concluded that the undisputed evidence suggested "that abortion care is one of the safest forms of medical care in this country and the world." *Weems II*, ¶ 46. The State had failed to offer any evidence suggesting that abortion care was any less safe than miscarriage care. *Weems II*, ¶ 47.

¶46 We recently analyzed a law requiring that providers possess a broad set of credentials and be capable of handling a large list of complications that could potentially

23

arise in the context of abortion care.  *Planned Parenthood of Mont. v. State*, 2025 MT 120, ¶¶ 101-106, 422 Mont. 241, 570 P.3d 51 ("*Planned Parenthood V*").  In *Planned Parenthood V*, the State argued that the law advanced "maternal health and the integrity of the medical profession by ensuring that practitioners are competent to address complications that may result."  *Planned Parenthood V*, ¶ 102.  However, the State conceded that Planned Parenthood of Montana ("PPMT") already had measures in place that properly ensured abortion providers could competently provide emergency care.  *Planned Parenthood V*, ¶ 105.  Thus, we concluded that the "State's own arguments show that the credentialing requirements do not appear to achieve any interest not already served by PPMT procedures but instead 'preclude qualified health care providers' from providing medication abortions and thus fail strict scrutiny."  *Planned Parenthood V*, ¶ 106 (quoting *Weems II*, ¶ 43).

¶47    Similarly, here, the evidence suggests it is not as if "abortion clinics" currently operate unregulated or unsafely.  Apart from HB 937, Montana licensed providers who provide abortion care, miscarriage care, or other gynecological care are all subject to licensing and regulation by the DLI under Title 37 and oversight by various medical licensing boards.  The State's own witness testified that to her knowledge, providers in clinics offering this sort of care operated without incident.  As in *Planned Parenthood V*, the State's witness's own testimony undermines any purported compelling state interest because rather than identifying a medically-acknowledged, bona-fide health risk, she affirmatively suggested that "abortion clinics" have been operating without incident.

¶48     Even if the State can later justify why treating "abortion clinics" like other "health care facilities," such as "outpatient centers for primary care" or "outpatient centers for surgical services,"[3] makes medical sense, the State would still have to advance a compelling state interest as to why providers who provide identical medications and procedures for only miscarriage treatment are not covered by the challenged laws. At this stage, this Court is unable to conceive of a compelling state interest that would justify singling out "abortion clinics" in the way that HB 937 and the Rules do.

¶49     Furthermore, as the District Court emphasized, a challenged law is not considered narrowly tailored if it is underinclusive or overinclusive in scope. *Planned Parenthood II*, ¶ 32 (citing *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020)). Even if the State shows a compelling state interest, that interest is likely not narrowly tailored. If the State does indeed show that HB 937 and the Rules reflect a compelling state interest to protect women from a medically-acknowledged, bona-fide health risk, then those same regulations should also apply to offices where miscarriage treatment is performed using the same medications and procedures. Thus, even assuming a compelling state interest exists, HB 937 and the Rules are likely underinclusive in that they fail to cover *all* providers who provide the same kinds of medications and procedures, regardless of the purpose.

---

[3] It is worth noting that even if the State can show why "abortion clinics" are comparable to other "health care facilities," the State would have a difficult time justifying why "abortion clinics" are subject to an annual $450 license fee under HB 937, while other "health care facilities" are only required to pay $20 every one to three years (depending on the license). 2023 Mont. Laws ch. 492, § 3(2)(d)(ii). Therefore, "abortion clinics" are also singled out within HB 937 from other "health care facilities" without any apparent explanation.

25

¶50   The State still has the opportunity to develop its arguments fully, but at this time, we conclude that the Plaintiffs are likely to succeed on their equal protection claim on the basis that HB 937 and the Rules improperly infringe on the fundamental right to privacy of women seeking abortion care.[4]

***Likelihood of Irreparable Harm***

¶51   Under the second element of the preliminary injunction standard, we must determine whether "the applicant is likely to suffer irreparable harm in the absence of preliminary relief." Section 27-19-201(1)(b), MCA. We have held that "'[f]or the purposes of a preliminary injunction, the loss of a constitutional right constitutes an irreparable injury.'" *Planned Parenthood III*, ¶ 32 (quoting *Driscoll v. Stapleton*, 2020 MT 247, ¶ 15, 401 Mont. 405, 473 P.3d 386); *see also MCIA I*, ¶ 15. The Plaintiffs must prove "that irreparable injury is likely, not merely speculative, in the absence of an injunction." *MAID*, ¶ 15 (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 375 (2008)). Infringement on the right to privacy has been "commonly recognize[d]" as causing irreparable injury. MAID, ¶ 16; Weems I, ¶ 25.

¶52   Here, the Plaintiffs are likely to be deprived of their right to equal protection, and such a constitutional deprivation constitutes an irreparable injury. In the absence of a

---

[4] The State argues that the District Court erred by stating in its Order that CI-128 "informs the Court's assessment of the Providers' showing of a likelihood of success on the merits." While CI-128 is now currently effective, it was not in effect at the time of the Order. Although it is unclear why the District Court referenced an unenforceable constitutional amendment at the time of its Order, we conclude that the Plaintiffs have sufficiently shown they are likely to succeed on the merits based on this Court's equal protection and right to privacy precedent alone. CI-128 does not inform this Court's reasoning of the Plaintiff's likelihood of success on the merits.

preliminary injunction, HB 937 and the Rules would take effect, and the Plaintiffs would be required to obtain a license and abide by a framework we have preliminarily deemed to violate the Plaintiffs' equal protection rights. Importantly, the Plaintiffs' patients would likely be prevented from accessing the care provided by the Plaintiffs. As the District Court explained, this outcome will happen by operation of law as soon as HB 937 and the Rules become enforceable: it is not merely speculative.

¶53 Unequal treatment is considered a constitutional injury. *See Heckler v. Mathews*, 465 U.S. 728, 739-40, 104 S. Ct. 1387, 1395-96 (1984). Since we have found that HB 937 and the Rules improperly distinguish between two similarly situated classes of providers, the Plaintiffs are likely to suffer irreparable harm in the form of unequal treatment under the law in contravention of Montana's equal protection clause. In the absence of a preliminary injunction, HB 937 and the Rules would become enforceable, thus immediately subjecting the Plaintiffs to all of the requirements, while simultaneously not subjecting miscarriage treatment providers who provide the same medications and procedures to the requirements.[5].

¶54 Beyond the harm inherent in being deprived of equal protection under the law, abortion access is likely impeded without a preliminary injunction, which raises right-to-privacy concerns. The potential for waivers within the Rules does not sufficiently

---

[5] The State argues that the District Court was required to identify a specific irreparable harm for each individual provision in HB 937 and the Rules. We conclude that the District Court did not abuse its discretion by not undertaking such a detailed level of analysis because equal protection concerns operate throughout all parts of the Rules. We further explain why such an analysis is not required in the severability section below.

protect the Plaintiffs from irreparable injury nor prevent HB 937 from implicating the right to privacy. The Plaintiffs have submitted applications for waivers to the DPHHS but have received no response other than that the DPHHS received the application. While the State's witness testified that any of the regulations may be waived on a clinic-by-clinic basis, the State's witness was not aware of any uniform or standard waiver form. The indeterminate waiver process makes the likelihood of the Plaintiffs' irreparable injury more concrete in that the Plaintiffs have no means of predicting or preparing for the DPHHS's decision of whether to grant waivers. Even if the DPHHS does eventually reach an agreement with the Plaintiffs and waive certain requirements, in the interim, the Plaintiffs would be forced to shut down their services or operate illegally, thus inhibiting access to abortion and implicating the fundamental constitutional concerns addressed above.

¶55   Overall, we conclude that the Plaintiffs have shown they and their patients are likely to suffer irreparable harm without a preliminary injunction.

***Balance of Equities and the Public Interest***

¶56   The third element is whether "the balance of equities tips in the applicant's favor." Section 27-19-201(1)(c), MCA. The fourth element considers whether "the order is in the public interest." Section 27-19-201(1)(d), MCA. These two elements merge into a single analysis when the government is the party opposing the preliminary injunction. *Planned Parenthood III*, ¶ 34. Importantly, the purpose of a preliminary injunction is to maintain the status quo and the parties' rights until a final judgment is issued on the merits. *Planned Parenthood III*, ¶ 16.

¶57 Here, the status quo has been that abortion providers are subject to the requirements under Title 37, MCA, and the supervision of the respective licensing boards thereunder. HB 937 departs from this status quo by subjecting "abortion clinics" to additional licensing and other new requirements, while not requiring the same for miscarriage treatment providers. For example, the Plaintiffs must now pay a $450 licensing fee to maintain their operations, meet detailed physical plant standards, and abide by other various policies and procedures under the Rules. Since HB 937 brings "abortion clinics" within the definition of "health care facilities" under Title 50, Chapter 5, MCA, if the Plaintiffs operate without a license, they become subject to civil penalties up to $1,000 per day. Sections 50-5-111(1), -112(1), MCA. The potential that the Plaintiffs will incur substantial fees is another likely hindrance to their patients' abortion care.

¶58 The analysis of the third and fourth elements is closely tied to the type of injury the Plaintiffs are likely to suffer. "'[T]he government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented.'" *Planned Parenthood III*, ¶ 36 (quoting *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017)). Here, we have concluded that the challenged laws likely implicate constitutional concerns under Montana's equal protection clause by threatening the fundamental right to privacy. Therefore, the State suffers no harm in being prevented from enforcing likely unconstitutional rules, and the balance of equities tips in the Plaintiffs' favor.

¶59 The State believes that the District Court failed to give proper weight to the harm the State faces by having its laws preliminarily enjoined. The United States Supreme Court

29

has stated that whenever "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303, 133 S. Ct. 1, 3 (2012) (order on stay application) (Roberts, C.J., in chambers). We agree with this proposition and emphasize the importance of the State enforcing democratically enacted laws in Montana. However, we cannot agree with the State that the State's potential injury in having its laws enjoined deserves the same or greater weight than the injury that the public faces when the State is allowed to enforce unconstitutional laws, especially when fundamental rights are likely infringed. "'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Planned Parenthood III*, ¶ 36 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). We conclude that the balance of equities tips in the Plaintiff's favor because they and their patients are likely to suffer constitutional harm without a preliminary injunction. Likewise, preventing constitutional injury is always in the public interest.

¶60   Since we conclude that the Plaintiffs meet each of the individual elements under § 27-19-201(1), MCA, we hold that the District Court did not manifestly abuse its discretion by preliminarily enjoining all of HB 937 and the Rules.

*Severability*

¶61   Finally, the State argues that the District Court abused its discretion by subjecting all the provisions to strict scrutiny and failing to identify an irreparable injury for each specific provision. The Plaintiffs respond that the District Court properly analyzed HB 937 and the Rules as a "Scheme" because they operate as a single unit with equal protection concerns pervading throughout. This Court agrees with the Plaintiffs.

30

¶62 "This Court attempts to construe statutes in a manner that avoids unconstitutional interpretation whenever possible." *Williams v. Bd. of Cnty. Comm'rs*, 2013 MT 243, ¶ 64, 371 Mont. 356, 308 P.3d 88. If a statute contains constitutional and unconstitutional provisions, we examine it to determine if it contains a severability clause. *Finke v. State ex rel. McGrath*, 2003 MT 48, ¶ 25, 314 Mont. 314, 65 P.3d 576. "[T]he inclusion of a severability clause is an indication that the drafters desired judicial severability policy to apply." *Sheehy v. Pub. Emps. Ret. Div.*, 262 Mont. 129, 141, 864 P.2d 762, 770 (1993).

¶63 In the absence of a severability clause, the "presumption is against the mutilation of a statute." *Sheehy*, 262 Mont. at 142, 864 P.2d at 770 (internal quotations omitted). Without a severability clause, "we must determine whether the integrity of . . . [the law] relies upon the unconstitutional provisions or whether the inclusion of these provisions acted as inducement to its enactment." *Finke*, ¶ 26. To sustain the remainder of the statute once the unconstitutional provisions are removed, the remainder "must be complete in itself and capable of being executed in accordance with the apparent legislative intent." *Finke*, ¶ 26.

¶64 We agree with the District Court's reasoning that HB 937's requirements and the Rules promulgated by the DPHHS are inexorably intertwined. HB 937 and the Rules require the threshold consideration of whether a facility falls within the definition of "abortion clinic." If it does, HB 937 and *all* the Rules apply. If it does not, HB 937 and the Rules do not apply. And as we analyzed above, the definition of "abortion clinic" likely produces two similarly situated classes that only differ in the purpose of the treatments provided. The State has failed at this stage to satisfy strict scrutiny and justify treating the

31

classes differently. Since each and every part of HB 937 and the Rules implicate equal protection concerns, no singular provision is capable of being upheld as constitutional. We, therefore, need not analyze HB 937 and the Rules in accordance with the severability principles cited above.

¶65 Even if we could parse out certain constitutional provisions and conduct a severability analysis, the principles of severability would favor viewing the entire "Scheme" as a single unit. HB 937 contains no explicit severability clause. The Rules also do not contain a severability clause. Therefore, the presumption is against piecemealing HB 937 and the Rules.

¶66 We conclude that the District Court did not manifestly abuse its discretion by not identifying a specific irreparable injury tied to each individual provision because equal protection concerns are likely ingrained within all parts of HB 937 and the Rules.

## CONCLUSION

¶67 Article II, Section 4, of the Montana Constitution guarantees equal protection under the law. The Plaintiffs have successfully demonstrated that they are likely to succeed on the merits of their equal protection claim, are likely to suffer irreparable harm in the absence of a preliminary injunction, the balance of equities tips in their favor, and a preliminary injunction is in the public interest. The case will proceed to trial, and all the parties will have the opportunity to further develop their arguments on the ultimate merits of the case.

¶68   Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ KATHERINE M. BIDEGARAY
/S/ INGRID GUSTAFSON
/S/ JAMES JEREMIAH SHEA

Justice James Jeremiah Shea, concurring.

¶69   I concur with the Court's Opinion.  I write separately because this case illustrates the precise problem that occurs when we attempt to regulate activity based solely on what motivated an individual to engage in that activity, particularly when it comes to the very private activity of seeking medical treatment.

¶70   It is uncontested that both the procedures and medications prescribed for miscarriage care and abortions are identical.  Opinion, ¶¶ 10, 30.  As acknowledged by both the Court's Opinion and the Dissent, the *only* distinguishing factor is the purpose for which the woman may be seeking the procedure or medication.  Opinion, ¶ 28; Dissent, ¶ 94.  The Dissent asserts that this Court's "continuing extremism on the abortion issue leads it to conclude that even an effort by the State to require a rodent-free and vermin-free medical environment for the abortion procedure is likely to be unconstitutional."  Dissent, ¶ 89.  Rather than being indicative of extremism, this statement illustrates the very essence of the equal protection issue at the heart of this case.  Since it is uncontested that the procedures and medications for both miscarriage care and abortion are identical, but these

33

requirements *only* apply when those procedures and medications are for the purpose of an abortion, the Dissent's assertion necessarily implies that the State has *no* interest in requiring "a rodent-free and vermin-free medical environment" for miscarriage treatment. Now *that* would be an extreme position. Certainly, the State must be opposed to rodents and vermin in *any* medical environment. So what can be the compelling interest for imposing these restrictions in one medical environment and not the identical other?

¶71 And when attempting to evaluate the practical applications of these statutes, what of the situations where the intentions of medical provider and patient are not so neatly defined? Consider a medical provider within an obstetric-gynecological or family medicine private practice who treats pregnant patients experiencing a miscarriage, with no intention of ever performing what the statute defines as an "abortion." During the first trimester, miscarriage symptoms like vaginal bleeding and uterine cramping are also common during a normal pregnancy. Comm. on Prac. Bulls.—Gynecology, Am. Coll. of Obstetricians & Gynecologists, *Prac. Bull. No. 200: Early Pregnancy Loss* (Nov. 2018), https://perma.cc/4MVS-WKUJ [hereinafter ACOG, *Early Pregnancy Loss*]. Although some miscarriages may be relatively easy to diagnose, others are not. ACOG, *Early Pregnancy Loss*, *supra*. The diagnostic process is complicated by the ultrasound guidelines published by the Society of Radiologists in Ultrasound (SORU), which are considerably more restrictive than past recommendations and have stricter diagnostic cutoffs than the large-scale clinical studies upon which they were based. ACOG, *Early Pregnancy Loss*, *supra*. For this reason, the American College of Obstetricians and Gynecologists emphasizes that it is "important to include the patient in the diagnostic process and to

*individualize*" the ultrasound guidelines "to patient circumstances." ACOG, *Early Pregnancy Loss*, *supra* (emphasis added).

¶72 When a patient is likely experiencing a miscarriage, and whose individualized circumstances indicate the need for more active miscarriage treatment, the patient, in consultation with her medical provider, may reasonably choose to pursue more active treatment rather than waiting to meet the more rigid SORU diagnostic criteria. *See* ACOG, *Early Pregnancy Loss*, *supra*. Consider a patient whose initial ultrasound shows a gestational sac without a yolk sac. Under the SORU guidelines, a second ultrasound showing the continued absence of a yolk sac or embryo is considered diagnostic of a miscarriage only if performed 14 days after the initial scan. ACOG, *Early Pregnancy Loss*, *supra* (citing Peter M. Doubilet et al., *Diagnostic Criteria for Nonviable Pregnancy Early in the First Trimester*, 369 N. Eng. J. Med. 1443, 1446 tbl.2 (2013)). But according to the study upon which the guidelines are based, the second ultrasound is considered diagnostic after 7 days. ACOG, *Early Pregnancy Loss*, *supra* (citing Yazan Abdallah et al., *Gestational Sac and Embryonic Growth Are Not Useful as Criteria to Define Miscarriage: A Multicenter Observational Study*, 38 Ultrasound in Obstetrics & Gynecology 503 (2011)). While some patients, in consultation with their provider and according to their individualized circumstances, may opt to wait 14 days for the confirming ultrasound, other individualized circumstances may call for prioritizing immediate treatment of the miscarriage without waiting. In the latter circumstance it is, at best, unclear whether treating the patient's miscarriage according to the patient's individualized circumstances and consistent with ACOG guidelines, but before meeting the SORU criteria, would legally

35

constitute an abortion pursuant to § 50-20-104(1), MCA.[1]  This is precisely because the treatments themselves are identical and the *only* distinguishing factor is the medical provider's intention.  But the medical provider's intention does not occur in a vacuum; it is necessarily guided by the individual patient's circumstances.  ACOG, *Early Pregnancy Loss*, *supra*.

¶73  Or consider the even more stark example of an ectopic pregnancy.  An ectopic pregnancy is a pregnancy that develops outside the uterus.  Iris T. Lee & Kurt T. Barnhart, *JAMA Patient Page: What Is an Ectopic Pregnancy?*, 329 J. Am. Med. Assoc. 434, 434 (2023), https://perma.cc/8YDF-7JA9.  An ectopic pregnancy cannot develop normally to term and may be life-threatening to the mother.  Lee & Barnhart, *supra*, at 434.  Even though the pregnancy cannot be carried to term, it is, as the name indicates, a pregnancy.  Prompt treatment is necessary because, if left untreated, it can cause the fallopian tube to rupture.  Lee & Barnhart, *supra*, at 434.  A ruptured ectopic pregnancy can result in death if patients do not receive urgent medical evaluation and prompt surgical intervention.  Lee & Barnhart, *supra*, at 434.  Although there can be a fetal heartbeat present in an ectopic pregnancy, because an ectopic pregnancy can be life-threatening, patients are treated as quickly as possible with either medication or surgery, "regardless of the presence of a fetal heartbeat."  Lee & Barnhart, *supra*, at 434.  If treated early, unruptured ectopic pregnancies may be treated with the administration of a medication called methotrexate, or minimally

---

[1] Section 50-20-104(1), MCA, defines "abortion" as "the use or prescription of any instrument, medicine, drug, or other substance or device to intentionally terminate the pregnancy of a woman known to be pregnant, with an intention other than to increase the probability of a live birth, to preserve the life or health of the child after live birth, or to remove a dead fetus."

invasive surgical procedures to remove the fetus. Lee & Barnhart, *supra*, at 434. Whether by the administration of methotrexate or through surgical intervention, the treatment of an ectopic pregnancy, particularly in situations where a fetal heartbeat is present at the time of treatment, would meet the legal definition of an abortion pursuant to § 50-20-104(1), MCA.[2] So even in the case of an ectopic pregnancy, where the medication administered or procedure performed would objectively *not* be for the "intention" of performing an abortion, it would nevertheless meet the statutory definition of an "abortion."[3]

¶74 In the examples of miscarriage treatment described above, once the medical provider performs a single procedure to treat a miscarriage or provides medication to five patients experiencing miscarriages, their private medical office would meet the "abortion clinic" definition under HB 937. *See* § 50-20-901(1), MCA. So even when a provider's intention was to provide medically necessary miscarriage care, they may nevertheless be

---

[2] Section 50-20-104(1), MCA, does not define "dead fetus," but presumably the presence of a fetal heartbeat would be the demarcation line.

[3] Notwithstanding the absence of an exception for ectopic pregnancies contained within § 50-20-104, MCA, the Dissent notes that ectopic pregnancies are excluded from the definition of abortion found in §§ 50-20-703(1)(c), 50-20-1002(1)(b)(i), and 50-4-1302(1)(b), MCA. Dissent, ¶ 96. But all of the statutes referenced by the Dissent as explicitly excluding the treatment of ectopic pregnancies from the definition of abortion, also explicitly limit their definitions to the respective parts of the MCA where they are found. *See* § 50-20-703(1)(c), MCA (defining abortion "[a]s used in this part"); § 50-20-1002(1)(b)(i), MCA (defining abortion "[a]s used in this part"); § 50-4-1302(1)(b)(iii), MCA (defining abortion "[a]s used in this part"). The rules promulgated by DPHHS explicitly adopt the definition of "abortion clinics" and any other "[t]erms used in these rules" as "the definitions provided in 50-20-901, MCA." Admin. R. M. 37.106.3101(2), (3) (2024). Section 50-20-901, MCA, provides for no exclusion for ectopic pregnancies and does not define abortion at all. Section 50-20-104(1), MCA, applies to the entirety of Title 50, Chapter 20, MCA, and does not exclude ectopic pregnancies from its definition of abortion. There exists no exception for the treatment of an ectopic pregnancy within either § 50-20-901, MCA, or § 50-20-104(1), MCA, and it is not the Court's function to insert what has been omitted but to ascertain and declare what, in terms of substance, is contained therein. *Bryer v. Accident Fund Gen. Ins. Co.*, 2023 MT 104, ¶ 42, 412 Mont. 347, 530 P.3d 801.

subject to the distinct licensure and regulatory requirements imposed on abortion clinics by HB 937, the implementing rules promulgated by DPHHS, and the general provisions governing health care facilities pursuant to Title 50, Chapter 5, MCA.

¶75 Abortion can be an emotionally charged issue, the implications with which many of us may struggle on a personal level. But on a professional level, if we take the emotional element out of this equation—as we are constrained to do—it lays bare the fundamental equal protection problem of imposing different standards and requirements on doctors and their patients who are seeking the *identical* medical treatment but for different reasons, particularly when the circumstances and conditions leading to the decisions regarding these treatments are inherently specific to the individual. By way of example, from an equal protection standpoint, how would the State justify a compelling interest for imposing more exacting standards and requirements on a doctor who prescribes Ozempic to patients for weight loss rather than diabetes? Or, how would the State justify a compelling interest for imposing more exacting standards and requirements on a doctor who performs breast reduction surgery on patients seeking the procedure for cosmetic purposes rather than to relieve back pain?

¶76 Decisions about medical care and the treatments sought and received based on those decisions are about as private as private can get. In Montana, our citizens saw fit to enshrine the right to privacy in our Constitution. Mont. Const. art. II, § 10. The framers of our Constitution viewed the right to privacy as so important that Article II, Section 10, was the only right that *explicitly* incorporated the highest level of scrutiny within the very

text of the provision.[4]  Before any of the current members of this Court were fitted for our robes, this Court held the constitutional right to privacy included an individual's right to make medical decisions without government interference. *Armstrong*, ¶ 75.  This is hardly radical thinking.  Under federal law, individuals can be criminally prosecuted, fined, and imprisoned for merely divulging someone's private medical information.  42 U.S.C. § 1320d-6.  If there is something this Court has been absolutist about over the decades, it is the appropriate protection of our citizens' constitutional right to privacy and to make decisions that are inherently private without government interference, regardless of our personal feelings or reservations about those decisions.  *That* is a badge of honor I will proudly wear.

/S/ JAMES JEREMIAH SHEA

Justice Jim Rice, dissenting.

¶77    The Court affirms the District Court's overbroad and incorrect analysis, resulting in a decision which appears to recognize a constitutional right of abortion providers to perform abortions free from usual regulation by the State, except by satisfying strict scrutiny review, an untenable conclusion that perpetuates the Court's flawed absolutist approach to the abortion right.  *Planned Parenthood V*, ¶ 157 (Rice, J., concurring in part and dissenting in part) ("The Court continues to push in the direction of absolutism" of the abortion right.); *see also* Noah Durnell & Rachael Dean, *Significant Montana Cases*,

---

[4] Article II, Section 36, of the Montana Constitution also requires a compelling government interest, but was not passed until 2024.

87 Mont. Law Rev. 223 (2026) ("As noted in the dissent [in *Planned Parenthood V*], since *Armstrong*, the Montana Supreme Court has not ruled in favor of any legislation seeking to regulate abortion. [*Planned Parenthood V*] reinforces that the Supreme Court is unlikely to uphold pre-viability abortion regulations in the future."). Before analyzing HB 937 and discussing the merits of the Court's conclusion, two preliminary matters are present: whether the District Court applied the proper preliminary injunction standards and whether HB 937 should be presumed to be constitutional.

***Preliminary Injunction Standards***

¶78 The District Court's analysis clearly included the wrong standards for issuance of a preliminary injunction. Citing *Stensvad v. Newman Ayers Ranch, Inc.*, 2024 MT 246, 418 Mont. 378, 557 P.3d 1240, the District Court stated that an applicant must make a "sufficient showing as to each of the[] elements," and that "the Montana Supreme Court has recently adopted the 'sliding scale' approach articulated in *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)." It then reasoned that "the strength of the Providers' showing is sufficiently strong" on this scale to justify entry of the injunction. However, the District Court's rationale has clearly been abrogated by the Legislature.

¶79 The Legislature rebuked this Court for adopting preliminary injunction standards contrary to its clear intent in *Stensvad*. *See Mont. Env't Info. Ctr. v. Off. of the Governor for State*, 2025 MT 112, 422 Mont. 136, 569 P.3d 555 (Rice, J., dissenting) ("Faced with a judicial holding that was directly contradictory to its intent, the Legislature acted immediately to restore the statute," and quoting the Legislature's statement in the restorative HB 409 that *Stensvad*'s "use of the serious questions test or any other sliding

scale test is contrary to [] legislative intent."). Apparently attempting to convey that such a rebuke was unnecessary, the Court reconstructs its holding in *Stensvad* by prevaricating that, actually, "*Stensvad* did not *require* district courts to apply the serious questions test in lieu of finding that each of the elements in § 27-19-201(1), MCA, were independently met." Opinion, ¶ 20 (emphasis in original). This is purely revisionist history, as *Stensvad* provided no such flexibility, no matter how much the Court wishes now that it had. Rather, *Stensvad* held that "the preliminary injunction standard sets forth a conjunctive test that requires an applicant to make a sufficient showing as to each of the four factors. The sufficiency of that showing *is determined* using the Ninth Circuit's serious questions framework." *Stensvad*, ¶ 29 (emphasis added); *see also Stensvad*, ¶ 26 ("The serious questions test is the best fit with Montana precedent."). The Court thus remanded the case to satisfy the Ninth Circuit's standard. *See Stensvad*, ¶ 30. *Stensvad* left no room for district courts to proceed with anything but the Ninth Circuit's standards, and, consequently, they have since applied sliding scales and the serious questions test, as did the District Court here, explaining that it applied both of them because of *Stensvad*: "the Montana Supreme Court has recently adopted the 'sliding scale' approach articulated in *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)." *See also* Anna Conley, *Preliminary Injunctions and the 2025 Montana Legislature's (Mostly Unsuccessful) Attempt to Reshape the Judiciary*, 87 Mont. Law Rev. 141 (2026) ("After the 2023 legislative changes to the preliminary injunction standard in Montana, it was an open question whether these sliding scale variations would apply in Montana courts. In 2024, the Montana Supreme Court answered this question in the affirmative by adopting

41

the serious questions test in *Stensvad v. Newman Ayers Ranch, Inc.*").  While the District Court also addressed other factors, the Legislature is entitled to a preliminary injunction determination on its challenged statute that is unadulterated by additional injunction considerations it has now rejected twice.  Thus, remand for a clean review would be appropriately ordered here.

***Presumption of Constitutionality***

¶80    The Court contends that a law affecting a fundamental right is not entitled to a presumption of constitutionality.  Opinion, ¶¶ 5, 23.  This is contrary to the law.  The presumed constitutionality of legislative acts has been an unwavering principle within the jurisprudence of our State and Country, and we have unfailingly recognized this principle. *See Weems II*, ¶ 34; *Planned Parenthood II*, ¶ 16.  The citations provided by the Court, namely *Mont. Democratic Party*, ¶ 11, and *Greely*, 193 Mont at 382-83, 632 P.2d at 303, offer no actual authority supporting the position against a presumption of validity.

¶81    The relevant portion of *Mont. Democratic Party*, ¶ 11, is as follows:

> Statutes are presumed constitutional, and the party challenging a statute has the burden of proving it unconstitutional or showing that the statute infringes on a fundamental right.  *Bd. of Regents of Higher Educ. of Mont. v. State,* 2022 MT 128, ¶ 10, 409 Mont. 96, 512 P.3d 748; *Weems v. State [Weems II],* 2023 MT 82, ¶ 34, 412 Mont. 132, 529 P.3d 798; *Mont. Auto. Ass'n v. Greely,* 193 Mont. 378, 382–83, 632 P.2d 300, 303 (1981).  If the challenger shows an infringement on a fundamental right, a presumption of constitutionality is no longer available.  *Greely*, 193 Mont. at 382–83, 632 P.2d at 303.

*Mont. Democratic Party*, ¶ 11.  There are three citations provided in paragraph 11 of *Mont. Democratic Party* that were offered to support the assertion that laws burdening

fundamental rights are not presumed to be constitutional.  The first citation, *Bd. of Regents of Higher Educ.*, ¶ 10, recites in its entirety:

> Statutes enjoy a presumption of constitutionality, and the party challenging a statute's constitutionality bears the burden of proving it unconstitutional beyond a reasonable doubt.  *State v. Knudson*, 2007 MT 324, ¶ 12, 340 Mont. 167, 174 P.3d 469.  An as-applied challenge alleges that a particular application of a statute is unconstitutional and thus depends on the facts of a particular case.  *City of Missoula v. Mountain Water Co.*, 2018 MT 139, ¶ 25, 391 Mont. 422, 419 P.3d 685.

*Bd. of Regents of Higher Educ.*, ¶ 10.  The second citation, *Weems II*, ¶ 34, recites in its entirety:

> Statutes are presumed to be constitutional, and we regard that presumed constitutionality as a high burden to overcome.  *Hernandez v. Bd. of County Comm'rs*, 2008 MT 251, ¶ 15, 345 Mont. 1, 189 P.3d 638 (citing *Montanans for the Responsible Use of the Sch. Tr. v. State ex rel. Bd. of Land Comm'rs*, 1999 MT 263, ¶ 11, 296 Mont. 402, 989 P.2d 800).  The challenging party bears the burden of proving the statute is unconstitutional.  *Molnar v. Fox*, 2013 MT 132, ¶ 49, 370 Mont. 238, 301 P.3d 824.  Separately, we have also recognized that "legislation infringing the exercise of the right of privacy must be reviewed under a strict-scrutiny analysis," which necessarily shifts the burden to the State to demonstrate that the legislation is "justified by a compelling state interest and [is] narrowly tailored to effectuate only that compelling interest."  *Armstrong*, ¶ 34. *While the analysis of a statute pertaining to fundamental rights will generally require a strict scrutiny review that ultimately shifts the burden, we still begin our review with the same principle: statutes are presumed to be constitutional. To do otherwise would infringe on the principle of separation of powers and the deference we give to the Legislature, as it is the Legislature's prerogative to legislate under their general police power, and not merely in those areas we do not consider fundamental.*

*Weems II*, ¶ 34 (emphasis added).  The third and final citation, *Greely*, 193 Mont. at 382-83, 632 P.2d at 303, provides in pertinent part:

> Whether enacted by the legislature or created by the people through initiative, all statutes carry with them a presumption of constitutionality. *State v. Erickson*, 75 Mont. 429, 438, 244 P. 287, 290 (1926).  When a statute

43

> is challenged as being unconstitutional, the challenger must show that it does in fact infringe upon a right guaranteed by the Constitution. *N.A.A.C.P. v. Alabama*, 357 U.S. 449, 78 (1958). When it has been demonstrated that a statute infringes upon First Amendment freedoms, a presumption of constitutionality is no longer available. *United States v. Cong. of Indus. Orgs.*, 335 U.S. 106, 140, [68 S.Ct. 1349, 1366] (1948) (Rutledge, J., concurring).

*Greely*, 193 Mont. at 382-83, 632 P.2d at 303.

¶82     Paragraph 10 of *Bd. of Regents of Higher Educ.* clearly fails to support the Court's position against a presumption of constitutionality for statutes burdening fundamental rights—it says nothing against the presumption of constitutionality. Paragraph 34 of *Weems II* stands directly contrary to the Court's position. Then, even a generous reading of the relevant portions of *Greely* reveals only that a law burdening the first amendment right loses its pre-decision presumption *after* "it has been demonstrated" the right has been infringed, but even that notion lacks presidential authority as it was a position argued in a concurrence in *Cong. of Indus. Orgs.*, and was not stated by the majority. Indeed, the majority in *Cong. of Indus. Orgs.* took the opposite view. *See Cong. of Indus. Orgs.*, 335 U.S. at 120-21, 60 S. Ct. at 1356-57 (citing *United States ex rel. Att'y Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 407-08, 29 S. Ct. 527, 536 (1909)). In *Delaware & Hudson Co.*, the U.S. Supreme Court upheld a federal statute barring railroad companies from transporting commodities they had produced, adopting a very narrow interpretation of the statute and choosing to presume the statute constitutional rather than addressing "grave constitutional questions" that would arise if it were to remove such a presumption:

> It is elementary when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be

unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity.

*Delaware & Hudson Co*, 213 U.S. at 407-08, 29 S. Ct. at 536 (citation omitted).

¶83    Moreover, in Montana, as explained in *Weems II*, we have clearly reasoned, repeatedly, that even when a challenged statute burdens a fundamental right, it nonetheless is given a presumption of constitutionality:

> While the analysis of a statute pertaining to fundamental rights will generally require a strict scrutiny review that ultimately shifts the burden, we still begin our review with the same principle: statutes are presumed to be constitutional.  To do otherwise would infringe on the principle of separation of powers and the deference we give to the Legislature, as it is the Legislature's prerogative to legislate under their general police power, and not merely in those areas we do not consider fundamental.

*Weems II,* ¶ 34.  Confusingly, the Court cites the above paragraph of *Weems II* in the same paragraph that it asserts that statutes burdening fundamental rights are *not* presumed constitutional.  Paragraph 11 of *Mont. Democratic Party*, also cites paragraph 34 of *Weems II.*

¶84    We have consistently recognized that challenged laws are presumed to be constitutional, whether they burden a fundamental right or suspect class.[1]  *E.g. Barrett v.*

---

[1] A presumption of constitutionality is the starting point, but the presumption can eventually yield to heightened levels of scrutiny.  *See Greely*, 193 Mont. at 382-83, 632 P.2d at 303.  However, before the presumption is removed, it is incumbent on the challenger to make a sufficient showing that the law in fact employs or is motivated by a suspect classification or burdens a fundamental right.  *See Mont. Democratic Party*, ¶ 11; *Greely*, 193 Mont. at 382-83, 632 P.2d at 303.  Federal courts follow a similar approach and grant statutes a presumption of constitutionality; yet that presumption can also be removed once the challenger makes a threshold showing of infringement on a fundamental right.  *See Miller v. Johnson*, 515 U.S. 900, 915, 115 S. Ct. 2475, 2489 (1995) ("Although race-based decisionmaking is inherently suspect, . . . until a claimant makes a showing sufficient to support that allegation the good faith of a state legislature must be presumed[.]" (internal citations omitted)); *Washington v. Davis*, 426 U.S. 229, 241, 96 S. Ct. 2040, 2048 (1976) ("With a prima facie case made out, the burden of proof shifts to the State to rebut the presumption

45

*State*, 2024 MT 86, ¶ 13, 416 Mont. 226, 547 P.3d 630 (Citizens challenged several house bills as violating the Board of Regents' authority under Article X, Section 9, of the Montana Constitution. "Statutes are presumed to be constitutional, and the party challenging a statute's constitutionality bears the burden of proving it unconstitutional beyond a reasonable doubt."); *Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, ¶ 10, 353 Mont. 265, 222 P.3d 566 (A citizen challenged a workers compensation statute as violating equal protection and substantive due process principles. "The constitutionality of a legislative enactment is prima facie presumed, and every intendment in its favor will be presumed, unless its unconstitutionality appears beyond a reasonable doubt."); *Matter of S.M.*, 2017 MT 244, ¶ 10, 389 Mont. 28, 403 P.3d 324 (A citizen challenged a Montana statute prohibiting waiver of counsel in civil commitment proceedings as violating the Sixth and Fourteenth Amendments of the U.S. Constitution. "Legislative enactments are presumed to be constitutional."); *Est. of McCarthy v. Mont. Second Jud. Dist. Ct., Silverbow Cnty.*, 1999 MT 309, ¶ 13, 297 Mont. 212, 994 P.2d 1090 (A citizen challenged a statute setting forth statute of limitations for medical malpractice as violating equal protection principles and right to access the courts under Article II, Section 5, of the Montana Constitution. "Statutes are presumed to be constitutional."); *State v. Nye*,

---

of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." (internal quotations and citations omitted)); *Harris v. McRae*, 448 U.S. 297, 299, 100 S. Ct. 2671, 2685 (1980) ("If a law impinges upon a fundamental right explicitly or implicitly secured by the Constitution [it] is presumptively unconstitutional. Accordingly, before turning to the equal protection issue in this case, we examine whether the Hyde Amendment violates any substantive rights secured by the Constitution." (internal quotations and citations removed)).

283 Mont. 505, 510, 943 P.2d 96, 99 (1997) (Citizens challenged a statute as violating federal and Montana free speech rights. "All statutes carry with them a presumption of constitutionality and it is the duty of the courts to construe statutes narrowly to avoid an unconstitutional interpretation if possible."); *Davis v. Union Pac. R. Co.*, 282 Mont. 233, 239, 937 P.2d 27, 30 (1997) (Out-of-state citizens challenged a Montana statute providing specific venues for tort suits as violating Montana's equal protection provisions. "A legislative enactment is presumed to be constitutional and will be upheld on review except when proven to be unconstitutional beyond a reasonable doubt."); *Weems II*, ¶ 34 (Citizens challenged a statute as violating Montana's right to privacy. "While the analysis of a statute pertaining to fundamental rights will generally require a strict scrutiny review that ultimately shifts the burden, we still begin our review with the same principle: statutes are presumed to be constitutional."); *Planned Parenthood II*, ¶ 16 (Citizens challenged a statute as violating Montana's right to privacy. "While the analysis of a statute pertaining to fundamental rights will generally require a strict scrutiny review that ultimately shifts the burden, we still begin our review with the same principle: statutes are presumed to be constitutional.").

¶85 Removing the presumption of validity guts a standing principle this Court has unfailingly supported: the Legislature and Court are separate but equal branches. *Planned Parenthood II, ¶ 16; Davis*, 282 Mont. at 239, 937 P.2d at 30. In *Davis*, we recognized that:

> The legislative and judicial are co-ordinate departments of the government of equal dignity; each is alike supreme in the exercise of its proper functions, and cannot directly or indirectly while acting within the limits of its authority

be subjected to the control or supervision of the other without an unwarrantable assumption by that other of power which, by the Constitution, is not conferred upon it. The Constitution apportions the powers of governments but it does not make any one of the three departments subordinate to another when exercising the trust committed to it.

*Davis*, 282 Mont. at 239, 937 P.2d at 30.

¶86    When the presumption of validity is removed, courts curtail the rightful power of the legislature—a notion dating back as far as Justice Marshall. *See Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 128 (1810) ("But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void."). In Montana, the burden the Court must meet to strike down a law as unconstitutional is "beyond a reasonable doubt." *Powell v. State Comp. Ins. Fund*, 2000 MT 321, ¶ 13, 302 Mont. 518, 15 P.3d 877; *Stratemeyer v. Lincoln Cnty.*, 259 Mont. 147, 150, 855 P.2d 506, 508 (1993); *Northwestern Mut. Life Ins. Co. v. Lewis & Clark Cnty.*, 28 Mont. 484, ___, 72 P. 982, 987 (1903) ("It is a fundamental rule that a reasonable doubt as to the constitutionality of a statute will be resolved in favor of its validity, and that the judiciary will not declare an act of the Legislature unconstitutional unless it is clear that such act is inhibited by the fundamental law.") (citations omitted). While it may be unclear what "beyond a reasonable doubt" means in this context, it is undisputed that at the very least courts must give deference to the Legislature and start with the presumption that a challenged law is constitutional. *Weems II*, ¶ 34. Because most constitutional challenges to legislation implicate a

fundamental right, the Court's contrary reasoning today effectively eliminates the presumption of constitutionality and furthers its undermining of the Legislature's proper constitutional role.

***Analysis of HB 937***

¶87    Regarding the substance of the claims, the Court reaches the conclusion that HB 937 and accompanying Rules will likely be proven to be unconstitutional.  Opinion, ¶ 50. Courts should be ever cognizant that the power to declare a legislative enactment unconstitutional is "the gravest and most delicate duty." *United States v. Raines*, 362 U.S. 17, 20, 80 S. Ct. 519, 522 (1960) (quoting *Blodgett v. Holden*, 275 U.S. 142, 148, 48 S. Ct. 105, 107 (1927) (Holmes, J., concurring)). "Every possible presumption must be indulged in favor of the constitutionality of a legislative act. . . .  The party challenging a statute bears the burden of proving that it is unconstitutional beyond a reasonable doubt and, if any doubt exists, it must be resolved *in favor of the statute*." *Powell*, ¶ 13 (emphasis added; internal citations omitted).  Even in the context of a preliminary injunction request, plaintiffs must demonstrate the likelihood that the presumption of constitutionality will be successfully overcome for any application of the challenged bills. *See City of Billings v. County Water Dist.*, 281 Mont. 219, 227, 935 P.2d 246, 250 (1997) (while petitioner for injunctive relief need not "prove beyond a reasonable doubt" that a challenged statute is unconstitutional, petitioner must nonetheless "must make out a prima facie case of unconstitutionality").  This is because every decision striking down a statute undermines the action of the Legislative branch and can "have a tendency over time to seriously weaken the democratic process." *State v. Gibbons*, 2024 MT 63, ¶ 80, 416 Mont. 1, 545 P.3d 686

49

(Rice. J., concurring in part and dissenting in part) (citing Alexander M. Bikel, *The Least Dangerous Branch* 21 (1962)), *overruled in part by State v. Cole*, 2026 MT 52, ___ Mont. ___, ___ P.3d ____.

¶88 Abortion is an issue of great concern in our democracy. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 223-24, 142 S. Ct. 2228, 2240 (2022) ("Abortion presents a profound moral issue on which Americans hold sharply conflicting views."); *Planned Parenthood II*, ¶ 56 ("We also acknowledge that the State has a substantial interest in preserving the family, protecting minors, and protecting the rights of parents to raise their children."); *Planned Parenthood V*, ¶ 129 (Rice, J., concurring in part and dissenting in part) ("Protecting life was the first purpose in the founding of our democracy, and it should continue to be recognized as the State's highest interest."). The Court lists "many laws passed by the Montana Legislature aimed at monitoring and regulating abortion" over the past 20 years. Opinion, ¶ 5. Yet, what remains unsaid is that this Court enjoined enforcement of each of these laws, followed by striking them down as unconstitutional as soon as it was presented with the opportunity. Though every one of them was supposed to have a presumption of constitutionality, none survived. The Court seems to offer this list as a badge of honor of what is, in collective totality, an extensive undermining of the democratic process.

¶89 I would conclude that the State is likely to prevail on the merits because HB 937, and the Rules accompanying thereto, do not violate the equal protection provision, and further, they do not infringe on a patient's fundamental rights and should be subject to rational basis review. "'The practice of medicine is a privilege, not a right, in Montana

50

and . . . it is generally subject to legislative oversight in order to protect the health, safety, and welfare of the people of Montana.'" *Weems II,* ¶ 38 (quoting *Armstrong*, ¶ 79 (Gray, J., specially concurring)). HB 937 and the Rules implement basic health and safety regulations on health care providers. For example, one licensure requirement provided in the Rules is that "an abortion clinic must be constructed and maintained so as to prevent as much as possible the entrance and harborage of insects, rodents, and other vermin capable of transmitting disease including, without limitation, rats, mice, mosquitos, and flies." Admin. R. M. 37.106.3103(1) (2024). Such rules are plainly intended to protect the health, safety, and welfare of patients who receive healthcare services. Implementing licensure requirements for abortion clinics to enforce basic health and safety regulations are within the police powers of the state and do not implicate a patient's fundamental rights. However, the Court's continuing extremism on the abortion issue leads it to conclude that even an effort by the State to require a rodent-free and vermin-free medical environment for the abortion procedure is likely to be unconstitutional.

### A. HB 937 and the Rules do not violate equal protection

¶90 A meritorious claim under the equal protection provision requires a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. *Powell*, ¶ 22. To prevail on an equal protection challenge, a party must demonstrate that the state has adopted a classification which discriminates against individuals similarly situated by treating them differently on the basis of that classification. *Rausch v. State Comp. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192. An equal protection analysis involves three steps, the first of which is to identify the classes

51

involved and determine if they are similarly situated. *Rausch*, ¶ 18. If the classes are not similarly situated, then the first criterion for proving an equal protection violation is not met, and it is unnecessary to analyze the challenge further. *Rausch*, ¶ 18.

¶91 The Court's rationale that "the *single factor* differentiating the classes is the purpose of the treatment offered—either to treat a miscarriage or induce an abortion," fails to recognize the distinctions at issue in this case and, in my view, is plainly incorrect. Opinion, ¶ 28 (emphasis added). HB 937 does not create similarly situated classes between abortion providers and miscarriage treatment providers. I begin with technical distinctions between the Court's proffered classes and then address the primary error in the Court's analysis.

¶92 For a health care provider to be subject to HB 937 or the Rules, the facility must perform at least five abortions annually. A facility that provides fewer than five abortions annually is not subject to licensure under HB 937 or the Rules. 2023 Mont. Laws ch. 492, § 1(b)(iv). Therefore, the number of abortions provided annually by a clinic is also a factor under the statute and thus the "the purpose of the treatment offered" cannot be the "single factor" under the Court's approach. Reducing the class distinctions under the statute to a single factor necessarily requires defining the classes as providers who perform more than five abortions annually and providers who perform fewer than five. The Court states that "a women seeking medical treatment for the purpose of an abortion *must* use a provider who complies with HB 937 and the Rules," Opinion, ¶ 32 (emphasis added), but a woman may well obtain an abortion at a facility that is not required to be licensed under HB 937 at all.

52

¶93 However, the Court's focus is not on the options of the patient, but on the rights of the provider, and therefore adopts the providers' argument that HB 937 treats them differently because the same licensing requirements do not apply to another kind of treatment: miscarriage medical care. Neither HB 937 nor the Rules even mention miscarriage care. Comparing abortion with miscarriage care in this context is a red herring offered by the providers that the Court swallows whole. The Court reasons that because the "same medications and procedures" are used for an abortion as are used in treating a miscarriage, such is sufficient to conclude that HB 937 and the Rules create two similarly situated classes. Opinion, ¶ 31. However, merely because there may be similar characteristics between abortion and miscarriage care does not give rise to an obligation to consider them to be the same or even similar in all respects. *See Tigner v. Texas*, 310 U.S. 141, 147, 60 S. Ct 879, 882 (1940) ("The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.").

¶94 It is an undisputed fact here that the fundamental distinction between abortion and miscarriage care is that, in the case of abortion, the provider uncontestably intends to, and acts to, bring about the termination of existing fetal life. In stark contrast, the miscarriage care provider neither intends to, nor acts to, terminate human life; rather, post-termination of life care is provided to the patient. Consequently, the two medical services drastically differ in intent, action, and in the consequential result, and the State's interest in regulating the procedures is also dramatically different. This is not a situation where the State's interest in the preservation of fetal life is minimized until viability. *See Planned Parenthood V*, ¶ 35 (explaining "the State's interest in preserving fetal life, or the fetus's

53

right to life" does not "take[] precedence over all constitutional protections and dignities of the mother" because "[t]he viability line [] strikes an appropriate balance of competing interests"). Rather, the health and safety protocols necessary to legally terminate human life must be in place for all stages. Thus, society is entitled to, and clearly does, have great concerns about the provision of abortion services that do not likewise exist in the provision of miscarriage care, as reflected by their elected representatives enacting HB 937. Regulation is vital. *See e.g. Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 802 (7th Cir. 2013) (Manion, J., concurring in part) (explaining that "a Philadelphia abortion doctor, Dr. Kermit Gosnell, was convicted of three counts of first-degree murder for the death of three infants delivered alive but subsequently killed at his clinic" utilizing egregious health care practices amidst grossly unsanitary conditions).

¶95 These distinctions were neither considered nor resolved in our previous holdings. *Weems II* discussed "protocols, procedures, and the attendant complications" of abortions in connection with the question of which healthcare professionals were qualified to perform the procedure. *Weems II*, ¶ 47. *Planned Parenthood II* involved a law prohibiting a minor's ability to obtain an abortion without parental consent. *Planned Parenthood II*, ¶ 6. *Planned Parenthood IV* addressed two laws and a rule adopted by DPHHS relating to Medicaid funding for abortion. *Planned Parenthood IV*, ¶ 4. We decided these cases without considering whether the provision of abortion and miscarriage treatments themselves necessitated the same facilities, regulations, and protections.

¶96 The Concurrence rests on an assertion that "the treatment of an ectopic pregnancy . . . would meet the legal definition of an abortion pursuant to § 50-20-104(1),

54

MCA." Concurrence, ¶ 73. This is incorrect, as Montana law explicitly excludes treatment of ectopic pregnancies from the definition of abortion. *See e.g.* §§ 50-20-703(1)(c), 50-20-1002(1)(b)(i), 50-4-1302(1)(b), MCA. The Concurrence proffers that regulating based on motivation could raise privacy issues, but that is not an issue here because HB 937 does not probe individual motives. It imposes basic licensure requirements on facilities performing the acknowledged procedure of abortion, when performing more than five abortions per year, and, to the main point, abortions are different than miscarriage treatment, so thus are not similarly situated procedures. *See Hensley v. Mont. State Fund*, 2020 MT 317, ¶ 19, 402 Mont. 277, 477 P.3d 1065. The two procedures clearly differ in intent, action, and, significantly, result. One procedure provides care in response to a natural loss; the other is an intentional termination of a developing pregnancy, i.e., human life, in which the State has an enhanced interest. *See Planned Parenthood V*, ¶ 35. Thus, the two procedures are not distinguished by mere motivation, but rather by significantly different outcomes. To illustrate by analogy, the same skin cut could be made by a surgeon and by an assailant, but the purposes and results are nonetheless different and necessitate different regulation: one is made to improve health, and the other to harm it.[2]

---

[2] The Concurrence obviously errs by suggesting an implication herein that the State has no interest in preventing rodents and vermin in facilities where miscarriage treatment occurs. Concurrence, ¶ 70. HB 937 seeks to classify abortion facilities as health care facilities subject to Title 50, Chapter 5 licensing requirements, the same chapter that already governs hospitals and clinics where miscarriage treatment takes place. *See* 2023 Mont. Laws ch. 492, § 5 (updating the definition of "heath care facility" to include abortion clinics). Equal protection does not require the legislature to solve every related problem in a single bill. *See Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489, 75 S. Ct. 461, 465 (1955) ("Evils in the same field may be of different dimensions and proportions, requiring different remedies. . . . The legislature may select one phase of one field and apply a remedy there, neglecting the others.") (internal citations omitted). The State can care about rodents in every medical setting and still rationally decide to

¶97    Accordingly, in my view, it is likely that HB 937 and the Rules do not violate equal protection. On their face, HB 937 and the Rules do not address miscarriage care and do not treat facilities differently based upon provision of abortion or miscarriage care alone. As HB 937 is applied, a facility that treats miscarriages need not be subject to HB 937 and the Rules to provide equal protection under the law because abortion and miscarriage care are very different. These distinctions establish that HB 937 does not discriminate between similarly situated classes. Because the State is likely to prevail on the first criterion for proving an equal protection violation, a prima facie case of an equal protection violation has not been established.

### B. HB 937 and the Rules do not implicate the right to privacy and are subject to rational basis review

¶98    The analysis again should begin with the genuine presumption that the challenged bill is constitutional. *Weems II*, ¶ 34. We employ a three-step analysis for bills challenged as a violation of the right to privacy: (1) does the law infringe on a fundamental right to privacy; (2) does the State assert a compelling interest; and (3) if the State's interest is compelling, is the law narrowly tailored to achieve that interest? *Planned Parenthood V*, ¶ 48 (citing *Wiser v. State*, 2006 MT 20, ¶ 19, 331 Mont. 28, 129 P.3d 133).

¶99    HB 937 and the Rules impose no restrictions upon patients, but only upon providers. The providers' arguments that they are already so burdened by the health-related regulations that the Constitution should protect them from the requirements of facility

_____

further enact a targeted measure classifying abortion facilities as health care facilities subject to Title 50, Chapter 5 licensing requirements without violating, in cases such as this, equal protection.

licensing raise a claim under our established jurisprudence governing the State's police powers. Specifically, the right to privacy provides no right to practice any profession free of state regulations promulgated to protect the public's welfare. *Mont. Cannabis Indus. Ass'n v. State*, 2012 MT 201, ¶ 21, 366 Mont. 224, 286 P.3d 1161. Rather, the State may regulate and license the health care profession for the safety of its citizens. *Wiser*, ¶¶ 18-19; *Planned Parenthood V*, ¶ 103 ("This Court acknowledged [in *Weems II*] the State's police power to regulate for the health and safety of its citizens and reasoned that the 'Legislature does not lose its authority to legislate in areas that have been delegated to the oversight of a board.'"). Therefore, not every restriction on medical care necessarily impermissibly infringes on the right to privacy. *Weems II*, ¶ 38. Other jurisdictions have broadly reached the same conclusion. *See Doane v. Dep't of Health & Hum. Servs.*, 2017 ME 193, ¶ 29, 170 A.3d 269, 278 ("It is through the professional licensing of physicians . . . that the State exercises its police power on behalf of all Maine citizens to 'preserv[e] . . . the health, safety and comfort of [its] citizens' from unqualified, incompetent, or unethical physicians."); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S. Ct. 2004, 2016 (1975) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions.").

¶100 Further, a patient's fundamental right to privacy is not infringed by licensing requirements imposed upon the medical profession by the Legislature. *See e.g. Wiser*, ¶¶ 18-20 (rejecting the argument that "Montanans have a fundamental right to seek medical

57

care from un-licensed professionals" because such a conclusion "would force the State and its licensing boards to demonstrate a compelling state interest in order to license and regulate health care professionals"); *Watson v. Maryland*, 218 U.S. 173, 176, 30 S. Ct. 644, 646 (1910) (affirming the constitutionality of a Maryland law requiring, in part, that all medical providers apply for a license, noting that "there is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine"); *N.Y. State Ophthalmological Soc'y v. Bowen*, 854 F.2d 1379, 1389 (D.C. Cir. 1988) ("We disagree that the constitutional right to privacy comprehensively protects all choices made by patients and their physicians or subjects to 'strict scrutiny' all government interference with choice of medical treatment.").

¶101 The Court reasons that HB 937 "implicates a patient's fundamental right to privacy and triggers strict scrutiny" because "qualified professionals are 'removed from the pool of health care providers from which women may choose to obtain lawful medical procedures.'" Opinion, ¶ 41 (quoting *Weems II*, ¶ 43). To the contrary, under HB 937, there are no qualified professionals who are removed or prohibited from lawfully providing medical care, which was the issue with the law addressed in *Weems II*. The law challenged in *Weems II* directly impacted providers by narrowing the pool of qualified health care providers who were lawfully permitted to provide abortions to only physicians and physician assistants, whereas providers who were otherwise professionally qualified but not a physician or physician assistant were excluded. *Weems II*, ¶ 4. This is a far cry from the provisions of HB 937 and the Rules, which do not restrict any professional from the provision of abortion services. HB 937 regulates *facilities*. Indeed, rather than limiting

the pool of providers, the licensure requirements outlined in HB 937 and the Rules may well have the opposite effect than in *Weems II*: any health care facility wishing to provide abortions can take the affirmative step of becoming licensed to do so, and soliciting patients based upon their licensure. Licensure requirements do not equate to prohibiting certain professionals from providing a service.

¶102 Rather than prohibiting certain abortion providers from delivering services, HB 937 and the Rules adopt basic health safety regulations for that service. In addition to those mentioned above, and others, the Rules require that abortion facilities performing more than five abortions per year have sufficient emergency exits, store garbage safely, and dispose of medicine appropriately. If such fundamental health and safety rules cannot be validly enforced upon an abortion clinic, then the Court is apparently holding that it is likely the Legislature is without police power to regulate abortion service providers. While the Court offers that providers of abortion are already regulated by the DLI under Title 37, MCA, this provides no justification beyond policy preferences for its decision. Many occupations and businesses are regulated by more than one agency, and the Court cites no authority that necessarily limits regulation of any particular economic activity to a single agency. *See Weems II*, ¶ 40 ("The Legislature retains its police power when it creates agencies and boards and delegates power to them."). The Court is simply constitutionalizing the providers' policy argument that they prefer no further regulation.

¶103 Rational basis review is appropriate when neither strict scrutiny nor middle-tier scrutiny apply. *Mont. Cannabis Indus.*, ¶ 16. Rational basis review is appropriate for health and safety regulation. *Wiser*, ¶¶ 18-20. The rational basis test requires a statute to

59

bear a rational relationship with a legitimate governmental interest. *Goble v. Mont. State Fund*, 2014 MT 99, ¶ 36, 374 Mont. 453, 325 P.3d 1211 (citing S*atterlee*, ¶ 18). Here, the State has a legitimate government interest in regulating facilities that provide more than five abortions annually to ensure that basic health and safety measures are taken to protect its patients, congruent with its compelling interest to ensure that human life is protected. Facilities that provide more than five abortions annually serve a larger number of patients, prepare more patient records, undertake more medical risk, and generate more medical waste than facilities that provide fewer than five abortions, making regulation thereof rationally related to these government interests. *See e.g. Planned Parenthood of Wisconsin*, 738 F.3d at 802 (Manion, J., concurring in part) (explaining the egregious health practices at the Gosnell clinic). The framework set out by HB 937, and the accompanying Rules, are legitimately intended to prevent such tragic practices, and would likely satisfy rational basis review.

### Severability

¶104 Consideration of whether portions of a law are severable is applicable when a law contains both constitutional and unconstitutional provisions. *Williams v. Bd. of Cnty. Comm'rs*, 2013 MT 243, ¶ 64, 371 Mont. 356, 308 P.3d 88 (citation omitted). The Court reasons that no parts of HB 937 and the Rules are severable because "equal protection concerns are likely ingrained within all parts of HB 937 and the Rules." Opinion, ¶ 66. As explained above, the core framework on HB 937 and the Rules should not be held to violate the equal protection provision, but further, the simple but necessary health and safety requirements are likely to be clearly permissible. Only absolutism in construing the

abortion right would lead to the conclusion that *all* such basic protections are likely to be unconstitutional. The District Court's order was likewise overbroad, concluding that every regulation implicated the fundamental rights of abortion providers, and failed to consider whether parts of HB 937 and the Rules could be upheld. To be sure, the State bears the burden at trial of demonstrating a basis for each regulation, and in that process, it is likely that many of the regulations will survive review if properly considered under rational basis review. However, some regulations may not survive. For example, depending on the State's proof, it may or may not be rational to require facilities to have patient rooms to be 100 square feet in size or hallways that are six feet wide. *See* Admin. R. M. 37.106.3103 (2024). Therefore, on remand, I would require consideration of whether individual rules can likely be upheld under rational basis review, again, with the requisite presumption that HB 937 is constitutional.

¶105 Therefore, I would conclude the State is likely to prevail on the merits, and likely to suffer irreparable harm if it is prohibited from adopting basic regulations. *See Planned Parenthood of Wisconsin*, 738 F.3d 786 at 802 (Manion, J., concurring in part). The balance of equities leans in the State's favor because the enjoinder of democratically enacted and constitutionally supported laws harms the State and the public interest in properly regulated abortion services. I would reverse the injunction and remand for application of the correct injunction standards.

/S/ JIM RICE

Chief Justice Cory J. Swanson joins in the dissenting Opinion of Justice Jim Rice.

/S/ CORY J. SWANSON